**J. Donald GOODWIN, Appellant,**

v.

**ELKINS & CO., Robert G. Hayden, Richard Sichenzio, and Gabriel F. Nagy, Appellees.**

No. 83–1295.

United States Court of Appeals, Third Circuit.

Argued Dec. 13, 1983.
Decided March 14, 1984.

David M. Doret (argued), Wolf, Block, Shorr & Solis-Cohen, Philadelphia, Pa., for appellees.

H. Donald Busch (argued), Lewis A. Grafman, Karen A. von Dreusche, Busch & Schramm, Bala Cynwyd, Pa., for appellant.

Before SEITZ, Chief Judge and GARTH, and BECKER, Circuit Judges.

## OPINION ANNOUNCING THE JUDGMENT OF THE COURT

GARTH, Circuit Judge.

In this case, we are asked to give further definition to what constitutes a security within the meaning of federal securities law. Goodwin asserts that his partnership contract in a brokerage firm is a security interest, enabling him to invoke the provisions of the Securities Exchange Act in seeking vindication of his claims. The district court, 558 F.Supp. 1375, held otherwise, and dismissed Goodwin's claim brought under federal securities law, and remitted his common law claims to arbitration. We affirm.

### I.

Plaintiff J. Donald Goodwin brought suit against the brokerage firm of Elkins & Co.[1]

---

1. The complaint also named as defendants Rob-   ert Hayden, Richard Sichenzio, and Gabriel

Goodwin, a former general partner of Elkins, alleged that he was induced to sell his partnership interest back to the firm based upon false representations made by the defendants. His complaint charged a violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1976), and of SEC Rule 10(b)(5), promulgated thereunder. It also raised state common law claims of fraud and breach of fiduciary duty. Jurisdiction was based on 28 U.S.C. § 1331 (1976) (federal question jurisdiction), under the court's pendent jurisdiction, and also under 28 U.S.C. § 1332(a) (1976), since there existed diversity of citizenship.

Elkins moved to dismiss the federal securities claim under Fed.R.Civ.P. 12(b)(6), and to compel arbitration of the remaining state claims, since the Elkins Partnership Agreement contained an arbitration clause. The district court granted the motion to dismiss, finding that Goodwin's partnership interest could not constitute a "security" within the meaning of the Act. It also remitted the state claims to an arbitrator. It is from these rulings that Goodwin appeals.

II.

As required by a Rule 12(b)(6) motion, all the factual allegations of Goodwin's complaint must be taken as true. Goodwin was a general partner with Elkins, and a registered representative. He had been associated with that firm for more than 20 years when, in 1981, he became dissatisfied with the management policies of the firm, and announced his resignation as of October 1981. He was prevailed upon by several partners of the firm to withdraw his resignation and continue with the firm until at least March 31, 1982, however, so as to avoid undue prejudice to the firm. In February 1982, Goodwin was advised that it would be more convenient if his withdrawal from the firm were to take effect as of January 1, 1982. Goodwin agreed to that suggestion, and his withdrawal from the firm was effectuated as if it had occurred on January 1, 1982. Goodwin asserts that, in connection with the February agreement, he was falsely and fraudulently advised that no sale or merger of the firm was planned; and that the defendants fraudulently concealed from him the fact that such negotiations were then being actively pursued. On March 17, 1982, when Goodwin would still have been a partner but for the February agreement, the Elkins firm was purchased by, and merged into, Bache, Halsey, Stewart, a large New York brokerage house, in a transaction which was financially advantageous to the general partners of the Elkins firm. In his suit, Goodwin sought to recover the difference between the amount paid to him upon his withdrawal (representing the value of his interest calculated as of January 1, 1982) and the amount which would have been paid to him had his interest been valued as of the date originally agreed upon, March 31, 1982.

■ Two issues are raised on this appeal. First, Goodwin contends that the district court erred in finding as a matter of law that his complaint could not state a claim under federal securities law. He also argues that the state law claims of fraud and breach of fiduciary duty are not within the scope of the Partnership Agreement's arbitration clause, and therefore it was error to send the proceedings to an arbitrator. We address these issues in turn.[2]

Nagy, as individual partners of the firm. All defendants will hereafter be referred to collectively as "Elkins."

2. As a preliminary matter, we note that appellate jurisdiction properly lies in this matter as a final decision under 28 U.S.C. § 1291 (1976). The defendants moved to dismiss the plaintiff's federal claims and to stay proceedings and compel arbitration. (The defendants' motion was entitled "Motion of Defendants to Dismiss and to Stay Proceedings and Compel Arbitration.) The district court granted the defendants' motion by dismissing the first count of Goodwin's complaint and then staying the proceedings pending the submission of all other claims to arbitration.

A fair reading of the record, and of the defendants' motion, leads us to construe the action taken by the district court as one compelling arbitration. We have held that such orders are

## III.

### A.

In enacting the Securities Exchange Act of 1934, we recognize that Congress intended to provide remedial legislation, which in turn must be liberally construed. *Tcherepnin v. Knight*, 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967). As the Supreme Court has noted, "[t]he definition of 'security' in the Securities Exchange Act of 1934 is quite broad. The Act was adopted to restore investors' confidence in the financial markets, and the term 'security' was meant to include 'the many types of instruments that in our commercial world fall within the ordinary concept of a security.'" *Marine Bank v. Weaver*, 455 U.S. 551, 555–56, 102 S.Ct. 1220, 1223, 71 L.Ed.2d 409 (1982) (quoting H.R.Rep. No. 85, 73d Cong., 1st Sess., 11 (1983)).

Nevertheless, the scope of federal securities laws is not without limitation, and Congress did not intend to create a federal cause of action for common fraud. *Marine Bank*, 455 U.S. at 556, 102 S.Ct. at 1223. It is therefore our task to determine whether the general partnership interest in a brokerage firm as described in Goodwin's complaint comes within the definition of the term "security." [3]

■ The seminal case in this area, *SEC v. W.J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), defined an investment contract [4] as:

a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party ...

*Id.* at 298–99, 66 S.Ct. at 1102–03. [5]

■ Goodwin acknowledges the inherent difficulty in treating a general partner as the holder of a "security" under the *Howey* test, since by definition he is presumed to

---

appealable under § 1291. *Gavlik Constr. Co. v. H.F. Campbell Co.*, 526 F.2d 777 (3d Cir.1975). *Cf. Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.*, 460 U.S. 1, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983) (order staying proceedings brought in federal court to compel arbitration, pending outcome of parallel state court suit, is appealable as final order under § 1291). *But see Kirschner v. West Co.*, 300 F.2d 133, 134 (3d Cir.1962) (in banc) (order staying proceedings pending arbitration in absence of motion to compel arbitration held not final for purposes of § 1291).

3. Section 3(a)(10) of the 1934 Act as set forth in 15 U.S.C. § 78c(a)(10), provides:

(a) ... When used in this chapter, unless the context otherwise requires—

(10) The term "security" means any note, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, pre-organization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit, for a security, or in general any instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace,

or any renewal thereof the maturity is likewise limited.

4. Although an "investment contract" is only one of the several categories of securities enunciated in the Securities Exchange Act (*see supra* note 3), we find that *Howey* and its progeny set out the dispositive definition in this case. We note that neither party argues that *Howey* does not announce the applicable analysis. Moreover, of the other categories of securities noted in § 3(a)(10) of the Act, the only other category which is colorably relevant is a "certificate of interest or participation in any profit-sharing agreement." Although a general partnership might literally fall within this description, the Supreme Court has held that "[a profit-sharing] provision alone is not sufficient to make that agreement a security." *Marine Bank v. Weaver*, 455 U.S. 551, 560, 102 S.Ct. 1220, 1225, 71 L.Ed.2d 409 (1982). We are satisfied that, regardless of whether an interest is characterized as an "investment contract" or as a "profit-sharing agreement," it still must meet the requirements of *Howey*.

5. While *Howey* interpreted a "security" as defined in § 2(1) of the Securities Act of 1933, 15 U.S.C. § 77b(1), it has been consistently held that this definition is essentially the same as that contained in the Securities Exchange Act of 1934, 15 U.S.C. § 78c, the statute which is at issue here. *E.g., United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 847 n. 12, 95 S.Ct. 2051, 2058 n. 12, 44 L.Ed.2d 621 (1975).

be personally involved in the management of the enterprise. Goodwin alleges, however, that in reality, he was invested with so little power and responsibility under the Elkins Partnership Agreement that his actual position was no more than that of a limited partner, and that effective control of the firm rested exclusively with the Managing Partner and the Management Committee of the firm. Goodwin asks that he be allowed to introduce evidence to support that allegation. We find, however, that even if his assertions were to be proved, the interest which Goodwin claims does not satisfy the requirement of a "security."

Even if the Elkins partnership may be deemed as a "common enterprise," as that term was used in *Howey's* definition of an investment contract, we are not persuaded by Goodwin's argument that he, as a general partner, could be "led to expect profits solely from the efforts of the promoter or a third party," and thus have his interest classed as an investment security. A general partner in Goodwin's firm, as in other similar firms, is unavoidably, even if unwillingly, a part of the operation of the enterprise. As the Sixth Circuit noted, "[t]he managerial powers vested in general partners and the express right of inspection of documents gives them the kind of leverage and ability to protect themselves that takes them outside the intended scope of the '34 Act." *Odom v. Slavik*, 703 F.2d 212, 215 (6th Cir.1983).

It is true that this Court has noted that the term "solely," as used in the *Howey* test (i.e. "a person invests his money in a common enterprise and is led to expect

profits *solely* from the efforts of [another]"), is not to be read literally when considering the efforts made by an investor. *Lino v. City Investing Co.*, 487 F.2d 689, 692 (3d Cir.1973). *Accord, SEC v. Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476 (9th Cir.), *cert. denied*, 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973). An investment contract or interest may still be classed as a security even if the investor is required to perform some duties, as long as those duties are "nominal or limited and would have little direct effect upon receipt by the participants of the benefits promised by the promoters." 487 F.2d at 692.

It is at this point that the views of the members of this panel to some extent diverge. Although the Court is unanimous that Goodwin's interest in the partnership does not qualify as a security under federal securities laws, Chief Judge Seitz and Judge Becker in their respective concurring opinions would confine their examinations to the Partnership Agreement, and so hold. While I agree with their conclusion, I would hold that Goodwin's interest does not qualify as a security primarily because the role of a general partner, *by law*, extends well beyond the permitted role of a passive investor.[6]

Accordingly, to the extent that I reach the same result as my two colleagues, but do so wholly by reference to the Pennsylvania Partnership Act, this portion of the opinion (the remainder of Part III.A.) expresses only my views and not those of Chief Judge Seitz or Judge Becker.

Under Pennsylvania's Partnership Act, Pa.Cons.Stat.Ann. tit. 59, §§ 301–365 (Purdon Supp.1983),[7] a general partner is an

---

6. I emphasize that, in characterizing Goodwin's role in the Elkins firm, I have been careful to observe the limitations placed upon us by the fact that this appeal arises from an order dismissing a complaint under Fed.R.Civ.P. 12(b)(6). Unlike Judge Becker, I believe we must take as true all factual allegations contained in *Goodwin's pleadings*, and must rule only on the facial validity of his complaint. To the extent that I rely on sources outside of the complaint to reach my conclusions, such reliance is based only upon relevant state statutes defining the role of general partners, of which judicial notice may be taken. *See infra* note 9.

7. Paragraph 2 of the complaint alleges that Elkins & Co. is a Pennsylvania limited partnership. App. at 2. Pennsylvania's Limited Partnership Act, in turn, provides that the powers, rights, and liabilities of a general partner in a limited partnership shall be determined by the law which would apply if there were no limited partners. Pa.Cons.Stat.Ann. tit. 59, § 523 (Purdon Supp.1983). The legal position of Goodwin within the Elkins firm is therefore determined by the Pennsylvania Partnership Act, *Id.* §§ 301–365.

agent of the firm, and the act of every partner, with only certain exceptions,[8] binds the partnership. *Id.* § 321. Admissions or representations made by a partner concerning partnership affairs is evidence against the partnership. *Id.* § 323. Notice to a partner of any matter relating to partnership affairs operates as notice to the partnership. *Id.* § 324. A wrongful act or breach of trust by a partner renders the partnership liable, *Id.* §§ 325–26, and each partner is subject to unlimited liability for partnership losses. *Id.* § 327.

Each partner has equal rights in the management and conduct of partnership business, subject to the provisions of the partnership agreement. *Id.* § 331(5). Each partner, however, has what amounts to an absolute veto power over any act sought to be performed by the other partners which contravenes the partnership agreement. *Id.* § 331(8).

It is manifest that any person who possesses the powers, rights, and responsibilities described above cannot have invested his capital with the expectation of profits derived *solely* from the efforts of others, and therefore cannot be the holder of a "security" as intended by the Act. Whatever subjective perceptions Goodwin may have entertained about his position in the firm, and whatever may have been the role he actually assumed, the *legal* interest which he enjoyed does not fall within the scope of the term "security" as intended by Congress. As noted by the court in *New York Stock Exchange v. Sloan*, 394 F.Supp. 1303 (S.D.N.Y.1975):

> [T]he determination whether the partnership interest of a general partner is a security does not and should not hinge on the particular degree of responsibility he assumed within the firm. The fact that a partner may choose to delegate his day-to-day managerial responsibilities to a committee does not diminish in the least his legal right to a voice in partnership matters, nor his responsibility under state law for acts of the partnership.

*Id.* at 1314. *Accord, Hirsch v. du Pont*, 396 F.Supp. 1214, 1220 (S.D.N.Y.1975), *aff'd*, 553 F.2d 750 (2d Cir.1977).

**B.**

Even if we were to limit our consideration of Goodwin's arguments to the Partnership Agreement which was annexed to Elkins' Motion to Dismiss,[9] the Partnership Agreement on its face reveals that non-management general partners in the Elkins firm retained significant managerial prerogatives. When these provisions are read in conjunction with the Pennsylvania statutes described above, it is evident that Goodwin's interest did not qualify as an investment security within the meaning of

---

**8.** *See infra* text at 107.

**9.** Although Goodwin attached a number of exhibits to the complaint, the one exhibit he did not attach but to which he referred in the text of his complaint was the 1981 Partnership Agreement. Elkins submitted a copy of the Partnership Agreement as an "Exhibit" to its motion to dismiss, and argued that Goodwin retained powers and duties under the Agreement, which put him outside the ambit of the federal securities laws. Before us, the defendants argued strongly that the provisions of the Agreement precluded relief under the federal securities laws.

In normal course on a Rule 12(b)(6) motion, we look only to the pleadings and take all factual allegations contained in the complaint as true. *E.g., Rogin v. Bensalem Twp.*, 616 F.2d 680, 685 & n. 14 (3d Cir.1980). I recognize that there is some authority for permitting reference to uncontradicted exhibits which were not made part of the complaint but which were attached to moving papers seeking dismissal. *See Provi-*

*dent Nat'l Bank v. Frankford Trust Co.*, 468 F.Supp. 448, 450 & n. 2 (E.D.Pa.1979); 5 Wright & Miller, Federal Practice and Procedure § 1357 at 593. *See infra* Opinion of Judge Becker. Because of our disposition, however, I believe we need not decide at this time the issue of how to treat a Rule 12(b)(6) motion when uncontradicted exhibits are before the court but were not made part of the complaint.

To the extent that Elkins bases its arguments on its "Exhibits," and in particular on the Partnership Agreement, such arguments might have been better made in connection with a motion for summary judgment rather than a motion to dismiss. Whether or not summary judgment would have been proper at this juncture, given the amount of discovery allowed and not allowed to the parties by the district court, is an entirely different question from the one presented here. *But see infra* Opinion of Chief Judge Seitz.

the federal securities law. We reach this conclusion with full recognition of the fact that Goodwin had been given no opportunity in the district court to flesh out his argument through discovery.

For example, the Partnership Agreement provides that any general partner may participate in the nomination, election, or removal of the Executive Committee and the Managing Partner. Partnership Agreement ¶ 6, App. at 45. The general partners as a group also maintain ultimate managerial control through oversight of the Executive Committee and the Managing Partner. *Id.* ¶ 7(a), App. at 45–46. General partners must approve new admissions into the partnership and involuntary terminations of the partnership. *Id.* ¶¶ 21a( )(i) & 23(a), App. at 60–61. All of these powers, even if Goodwin failed to exercise them, provided him with a substantial role in the management of the firm notwithstanding any restrictions specified by the Agreement.

### C.

In support for his position that a general partnership interest could conceivably constitute a security, Goodwin relies upon *Williamson v. Tucker*, 645 F.2d 404 (5th Cir. 1981), *cert. denied*, 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1982). In *Williamson*, the Fifth Circuit had before it a real estate venture which took the form of a general partnership. The district court had found that such interests could not constitute securities, and dismissed the suit under Fed.R.Civ.P. 12(h)(3) for lack of subject matter jurisdiction. The Court of Appeals reversed, and in doing so commented on the possibility that a general partnership interest could constitute a security. It first acknowledged what we have stated previously: that interests in general partnerships as a rule do not constitute security interests. It continued:

> Although general partners and joint venturers may not individually have decisive control over major decisions, they do have the sort of influence which generally provides them with access to important information and protection against a dependence on others. Moreover, partnership powers are not in the nature of a nominal role in the enterprises which a seller of investment contracts would include in order to avoid the securities laws; on the contrary, one would expect such a promoter to insist on ultimate control over the investment venture. An investor who is offered an interest in a general partnership or joint venture should be on notice, therefore, that his ownership rights are significant, and that the federal securities acts will not protect him from a mere failure to exercise his rights.

645 F.2d at 422.

The *Williamson* court, however, would apparently hold open the possibility, however faint, that a general partnership interest can, under unusual circumstances, meet the *Howey* requirements and thereby fall within the protection of the Act. The court stated:

> [T]he mere fact that an investment takes the form of a general partnership or joint venture does not inevitably insulate it from the reach of the federal securities laws.... If, for example, the partner has irrevocably delegated his powers, or is incapable of exercising them, or is so dependent on the particular expertise of the promoter or manager that he has no reasonably alternative to reliance on that person, then his partnership powers may be inadequate to protect him from the dependence on others which is implicit in an investment contract.

> Thus, a general partnership in which some agreement among the partners places the controlling power in the hands of certain managing partners may be an investment contract with respect to the other partners. In such a case the agreement allocates partnership power as in a limited partnership, which has long been held to be an investment contract. Similarly, one would not expect partnership interests sold to large numbers of the general public to provide any real partnership control; at some point there would be so many partners that a

partnership vote would be more like a corporate vote, each partner's role having been diluted to the level of a single shareholder in a corporation. Such an arrangement might well constitute an investment contract.

645 F.2d at 422–23 (citations omitted). The *Williamson* court itself acknowledged, however, that the exception it would carve out to the general rule is a narrow one.

[A]n investor who claims his general partnership or joint venture interest is an investment contract has a difficult burden to overcome. On the face of a partnership agreement, the investor retains substantial control over his investment and an ability to protect himself from the managing partner or hired manager. Such an investor must demonstrate that, in spite of the partnership form which the investment took, he was so dependent on the promoter or on a third party that he was in fact unable to exercise meaningful partnership powers. A general partnership or joint venture interest can be designated a security if the investor can establish, for example, that (1) *an agreement among the parties leaves so little power in the hands of the partner or venturer that the arrangement in fact distributes power as would a limited partnership;* or (2) the partner or venturer is so inexperienced and unknowledgeable in business affairs that he is incapable of intelligently exercising his partnership or venture powers; or (3) the partner or venturer is so dependent on some unique entrepreneurial or managerial ability of the promoter or manager that he cannot replace the manager of the enterprise or otherwise exercise meaningful partnership or venture powers.

*Id.* at 424 (emphasis added).

If the reasoning in *Williamson* is accepted, then Goodwin's position might be more substantial than we find it.[10] The complaint explicitly alleged that:

Despite the fact that certain passive partners, such as Goodwin, were denominated as general partners, the terms of the limited partnership agreement left so little control in the hands of Goodwin and other passive general partners who did not serve on the executive committee, that the arrangement distributed control with respect to those general partners including Goodwin as it did with the limited partners.

Complaint ¶ 17, App. at 6. Quite literally, and no doubt intentionally, this language puts the pleadings within the exception enunciated in *Williamson*, which might protect the viability of the federal claim against a motion to dismiss, and allow a plaintiff to raise factual issues.[11]

---

**10.** Were we to accept *Williamson*, then Goodwin would be entitled to introduce evidence to support his allegation that he had little or no power in the Elkins firm. The docket sheets disclose, however, that the district court ruled on Elkins' motion to dismiss before Goodwin had the opportunity to conduct discovery or to develop a factual record.

**11.** We also note that, to the extent *Williamson* would allow some forms of general partnerships to constitute "securities," it is arguably obiter dictum. The *Williamson* court was reviewing an order of the district court that dismissed a federal securities claim for *lack of subject matter jurisdiction.* As the Fifth Circuit noted in its opinion, the test for subject matter jurisdiction under such circumstances is whether the plaintiff's federal claim "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous." *Bell v. Hood,* 327 U.S. 678, 682, 66 S.Ct. 773, 776,

90 L.Ed. 939 (1945). "A claim is insubstantial only if its unsoundness so clearly results from the previous decisions of this [the Supreme] court as to foreclose the subject and leave no room for the inference that the questions sought to be raised can be the subject of controversy." *Hagans v. Levine,* 415 U.S. 528, 538, 94 S.Ct. 1372, 1379, 39 L.Ed.2d 577 (1974).

We agree that the claims raised in *Williamson,* and indeed the claims raised here, were not so devoid of merit and utterly frivolous as to require dismissal for lack of jurisdiction. That inquiry, however, is far different from the one we address here, i.e., whether dismissal under Fed.R.Civ.P. 12(b)(6) for failure to state a cause of action is warranted. The *Williamson* court did no more than to hold that federal jurisdiction had been established before remanding for further proceedings. It explicitly declined to discuss whether summary judgment could have been granted. 645 F.2d at 426, and was silent on the propriety of a 12(b)(6) motion. Its actu-

Goodwin's sole argument under *Williamson* is that the Elkins Partnership Agreement so limited his power that he was, in essence, a mere limited partner. As we have noted, however, whether a partnership interest constitutes a security depends on the *legal* rights and powers enjoyed by the investor. Whatever may have been the effect of the Partnership Agreement, we are not persuaded that it could so diminish the statutory powers of a general partner in the partnership, such as Goodwin, that the partnership interest which he possessed could qualify as a security.

We of course do not quarrel with the general proposition that the legal powers of a participant in a joint enterprise may be derived from private agreements and contracts, as well as public statutes. Indeed, we need look no further than *SEC v. Howey* itself for an example of a situation in which the interest created was defined primarily, if not solely, by an agreement between the parties.[12] Where, however, there exists both a statute which affects the rights and powers of participants in an enterprise, as well as a private agreement, then we must read the statute and the private agreement in conjunction with each other in order to determine the legal powers that results.[13]

Our analysis of the resultant legal powers vested in Goodwin leads to the conclusion that he still necessarily enjoyed such significant prerogatives in the operation of the firm that his interest could not be a "security." Taking as true Goodwin's allegations that the Elkins Partnership Agreement sought to limit severely his role in the

management of the partnership, nevertheless, Pennsylvania's Partnership Act puts its own limitations on the extent to which a general partner can be so restricted. Significantly, a non-management general partner is still an agent of the firm, and indeed can *bind* the firm and conduct firm business with third parties in the same manner as a management partner, *even if such acts contravene the provisions of the partnership agreement*, unless the third party has actual knowledge of the non-management partner's lack of authority under the agreement. Pa.Cons.Stat.Ann. tit. 59, § 321. Nor can an agreement absolve the partnership of liability for a partner's wrongful acts or breaches of duty, or absolve a partner from liability for partnership losses. Notice to a particular non-management partner would remain notice to the partnership, and his admissions would still be evidence against the firm. *See supra* text at 103–104.

Indeed, the major effect that a partnership agreement would appear to have, is on the rights of partners *inter sese*. Thus, a partnership agreement may modify a partner's right to a voice in management as that right relates *to other partners*. It could not, however, diminish the power of a partner to represent the firm outside the partnership, below what the Pennsylvania statute has set forth as a minimum. Even if the Elkins Partnership Agreement contained the most draconian restrictions on the rights of non-management partners therefore, such partners would still possess a quantum of powers and responsibilities which, as a matter of law, would preclude their interest from being considered a security under the Act.[14]

---

al ruling, therefore, is inapposite to the proceedings presented here.

**12.** *Howey* involved a private contract for the sale of plots in a citrus grove, along with a service contract to cultivate, harvest, and market the crops.

**13.** A private contract may of course not overrule a public law, but in many instances the statute explicitly allows its provisions to be altered by agreement. Our task, therefore, may simply be one of harmonizing the two different sources of substantive rights.

**14.** The argument that an investor who was only one of many general partners would have such a diluted interest in the enterprise that his role would become analogous to that of a corporate shareholder is also unconvincing. *See Williamson*, 645 F.2d at 423. If we were to consider a large Wall Street law firm with 54 partners, as contrasted with a small close corporation of only 20 shareholders, we still would find the latter to comprise a "security" but not the former. General partners, no matter how many or few they may be, are still, as a group, legally responsible for the management of the firm.

We therefore conclude that a participant who holds a general partnership interest in an enterprise, at least as that interest is defined under Pennsylvania law,[15] does not possess a security within the meaning of federal securities law. We will therefore affirm the order of the district court which dismissed Goodwin's federal securities claims.

## IV.

Since we find that the district court properly dismissed Goodwin's federal securities claims, his complaint is reduced to an action in diversity for fraud and breach of fiduciary duty under state law. Before discovery could commence, Elkins moved to compel arbitration of these state claims under the Partnership Agreement's arbitration clause. The district court agreed with Elkins, and remitted Goodwin's state claims to an arbitrator. For the reasons expressed below, we hold that arbitration was proper under the Agreement, and will therefore also affirm that portion of the district court's order which committed the state claims to arbitration.[16]

## A.

▮▮▮ The initial issue which confronts us is what law to apply in gauging the propriety of the district court's arbitration order. Although Elkins originally moved before the district court for arbitration under the Federal Arbitration Act, and has cited to that Act in its brief, both parties argue state law in discussing the Partnership Agreement's arbitration provision.

Arbitrability, of course, is purely a matter of contract. *E.g. United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *Commercial Metals Co. v. Balfour, Guthrie & Co.*, 577 F.2d 264 (5th Cir.1978); *United Steelworkers v. Crane Co.*, 456 F.Supp. 385 (W.D.Pa.1978). In resolving such a question of contract, a federal court sitting in diversity would normally be bound by state law under the *Erie* doctrine.[17] In enacting the Federal Arbitration Act, 9 U.S.C. §§ 1–13, however, Congress intended to establish a uniform federal law over contracts which fall within its scope. Thus, if the Arbitration Act is deemed applicable, federal law applies in construing and enforcing an arbitration clause, even in those cases in which jurisdiction is based on diversity. *Huber, Hunt & Nichols, Inc. v. Architectural Stone Co.*, 625 F.2d 22 (5th Cir.1980); *Becker Autoradio USA Inc. v. Becker Autoradiowerk GmbH*, 585 F.2d 39 (3d Cir.1978); *Collins Radio Co. v. Ex-Cell-O Corp.*, 467 F.2d 995 (8th Cir.1972). Indeed, it applies to proceedings in state courts as well as federal courts. *Southland Corp. v. Keating*, — U.S. —, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984).

▮▮▮ To be included within the coverage of the Federal Arbitration Act, an arbitration provision must be contained in a "contract evidencing a transaction involving commerce," 9 U.S.C. § 2. For the arbitration provision at issue here to be construed under federal law, therefore, the Elkins Partnership Agreement must be

Shareholders, however, no matter how many or few they may be, have a legally circumscribed role in the management of a corporation. State corporation statutes uniformly invest exclusive power to manage the ordinary business affairs with the Board of Directors, and indeed the very concept of a corporation is one in which the control of assets is divorced from ownership.

**15.** Pennsylvania has adopted the Uniform Partnership Act and the Uniform Limited Partnership Act, and therefore its provisions should be typical of most state statutes in this regard.

**16.** As the Supreme Court has stated, "Contracts to arbitrate are not to be avoided by allowing one party to ignore the contract and resort to

the courts. Such a course could lead to prolonged litigation, one of the very risks the parties, by contracting for arbitration, sought to eliminate." *Southland Corp. v. Keating*, — U.S. — at —, 104 S.Ct. 852 at 856, 79 L.Ed.2d 1 (1984).

Because we find that the federal securities claims were properly dismissed, the rule in *Wilko v. Swan*, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953), which exempts securities claims from arbitration provisions, is inapplicable.

**17.** *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

found to be a contract evidencing a transaction in interstate commerce. Such a finding, however, is a *factual* determination which must be made initially by the district court. Here, however, the district court made no findings on whether the Elkins Partnership Agreement constituted a contract evidencing transaction in commerce and did not state under what law it was committing the matter to arbitration. As we noted in *Gavlik Construction Co. v. H.F. Campbell Co.*, 526 F.2d 777 (3d Cir. 1975), "[t]he absence of these findings precludes our consideration of the applicability of the arbitration act." *Id.* at 784. Although it is certainly possible that the partnership agreement of a brokerage firm dealing with securities involves interstate commerce,[18] we cannot make this assumption without a proper factual predicate. "However much we may speculate on what may have been the nature of the performance required by the contract, it is impossible for us to determine on appeal whether the United States Arbitration Act applies. For to do so would require us to make an initial factual determination whether the contract evidence 'a transaction involving commerce' within the meaning of § 2 of the Act." *Merritt-Chapman & Scott Corp. v. Pennsylvania Turnpike Commission*, 387 F.2d 768, 772 (3d Cir. 1967).

■ We could, of course, remand the matter to the district court for the requisite finding as to commerce if no other alternative were available. *Gavlik*, 526 F.2d at 784. We find, however, that whether fed-

eral or state law is applied makes no difference in the substantive result,[19] and therefore perceive no reason to prolong these proceedings. We will rely on state law in our discussion, although the same outcome would doubtlessly obtain if we were to apply the Federal Arbitration Act. We therefore turn to the substantive question of whether, under Pennsylvania law, Goodwin's claims of fraud and breach of fiduciary duty are within the scope of the Partnership Agreement's arbitration clause.

### B.

■ Paragraph 31 of the Elkins Partnership Agreement contained the following provisions.[20]

31. *Arbitration.* Any controversy arising hereunder will be determined by arbitration pursuant to the Constitution and Rules of the Board of Governors of the New York Stock Exchange. If for any reason such arbitration is not possible, such controversy will be submitted to the American Arbitration Association for arbitration under its Rules but before a panel of at least three arbitrators. If possible, such arbitrators shall include one partner or a member firm of the New York Stock Exchange, one officer of at least the rank of vice president of a Philadelphia bank or trust company and one member of the Bar practicing in Philadelphia. The written decision of a majority of said arbitrators will be binding and conclusive upon the parties hereto.

On its face, the Elkins Agreement's arbitration clause is broad in sweep. *"Any*

---

18. *See Fox v. Merrill Lynch Co.*, 453 F.Supp. 561 (S.D.N.Y.1978) (employment contract which incorporated N.Y. Stock Exchange arbitration provisions involved interstate commerce and was governed by federal arbitration act); *Dickstein v. du Pont*, 320 F.Supp. 150 (D.Mass.1970), *aff'd*, 443 F.2d 783 (1st Cir.1971) (employment contract between account executive and member firm of N.Y. Stock Exchange, which contemplated that account executive would travel or solicit customers in other states involved interstate commerce); *cf. Tallis v. Kohlmeyer & Co.*, 551 F.2d 632 (5th Cir.1977) (validity of arbitration clauses in application for allied membership in stock exchange governed by federal law).

19. *See infra* note 23.

20. Although, in ruling upon the dismissal Goodwin's federal securities claims, we questioned without deciding whether it was appropriate to consider the actual text of the Elkins Partnership Agreement (*see supra* notes 6 & 9), examination of the Agreement is obviously warranted in determining the arbitrability of the state law claims. Since Elkins raises arbitration as an equitable defense, it is not only proper, but required that it produce evidence to support it.

*controversy arising hereunder"* is committed to arbitration. It has been settled that such expansive clauses may cover not only disputes arising during the life of an agreement, but also those which arise from its demise. The Pennsylvania Supreme Court dealt with a provision similar to the one in this case in *Waddell v. Shriber,* 465 Pa. 20, 348 A.2d 96 (1975) (*Wadell I*) (construing provision of N.Y. Stock Exchange Constitution which commits "any controversy between parties" to arbitration). The court held that:

> When parties create a contractual relationship which includes a broad arbitration agreement, they intend to include within the scope of arbitration any dispute arising from the termination of that contractual relationship *unless they clearly evidence a purpose to exclude such disputes.*

*Id.* at 101 (emphasis added).

■ Here, Goodwin complains that, in dealing with the termination of his interest in the partnership, Elkins acted tortiously by withholding pertinent information from him. Such a dispute, however, arises from the very provisions of the Agreement. Paragraph 27 of the Partnership Agreement provides:

> 27. *Valuation and Payment of Interests of General Partners.*
>
> (a) Upon the termination of the Partnership or the Membership of a General Partner ... *the value of the interest of such Partner* (hereinafter referred to as the "retiring Partner") *in the Partnership will be determined by the Partnership as of the Inventory Date* subject to the right of the retiring Partner to request an audit (the cost of which audit shall be borne entirely by such Partner) by independent certified public accountants selected by the Partnership (who may be the independent certified public

accountants regularly engaged by the Partnership), in accordance with generally accepted accounting principles consistingly applied and with such reserves for contingencies or otherwise as may be deemed necessary or proper, subject to the following provisions: [21]

Disputes over the value of Goodwin's share of the Partnership upon termination, therefore, arise out of the Agreement itself, and would be arbitrable.

■ The fact that Goodwin's state claims are phrased in terms of "fraud" and "breach of fiduciary duty" does not remove them from the scope of the arbitration clause. Intentional torts even less connected to the actual terms of the contract have been found by Pennsylvania courts to be subject to arbitration. In *Waddell v. Shriber,* 238 Pa.Super. 241, 357 A.2d 571 (1976) (*Waddell II*), the court considered whether a claim for *defamation* was arbitrable,[22] when the alleged defamatory language was uttered in connection with the termination of a partnership interest. The *Waddell II* court noted:

> The NYSE constitution provides for the arbitration of "any controversy". While it is true that the intentional tort of defamation is not normally arbitrated, the agreement to arbitrate does not exclude this claim. The phrase "any controversy" is certainly broad enough to embrace tort as well as contractual disputes, the only limitation being that the dispute has its roots in the applicable relationship between the parties.

357 A.2d at 573. If defamation uttered in connection with the termination of a partnership interest is considered to be an arbitrable dispute, then it would seem *a fortiori* that fraud, committed while a party was actually executing the very provisions of the Agreement dealing with termination, is also arbitrable.[23] Such a dispute seems to

---

**21.** The Agreement then lists various rules and procedures to be used in arriving at value for the partnership.

**22.** *Waddell II* involved the same parties and agreements as did *Waddell I.*

**23.** Goodwin argues that *Waddell II* was wrongly decided, and need not control since it was decided only by an intermediate state court. While it is true that we may not be bound by a lower state court's interpretation of state law if we are convinced that the Pennsylvania Su-

us clearly to have "its roots in the applicable relationship between the parties."

The Elkins Partnership Agreement contains as broad an arbitration provision as is usually encountered in normal course. We find that it is broad enough to cover the disputes raised by Goodwin. His allegations of tortious conduct by the defendants, in connection with the termination of his partnership interest, fall squarely within the subject matter of the Partnership Agreement. Significantly, the parties did not "clearly evidence a purpose to exclude such disputes." *Waddell I*, 348 A.2d at 101. We therefore conclude that the district court properly relegated Goodwin's state claims of fraud and breach of fiduciary duty to arbitration.

### V.

The order of the district court dismissing Goodwin's federal securities claims, and directing that the remaining state claims be arbitrated, will be affirmed.[24]

SEITZ, Chief Judge, concurring.

While I join the judgment of the court affirming the order of the district court dismissing the federal claims and directing arbitration of the state claims, I write separately because I differ somewhat from my colleagues on the governing analysis.

Goodwin's complaint contained federal securities claims and state law claims for fraud and breach of fiduciary duty. Elkins moved to dismiss the federal securities claims under Fed.R.Civ.P. 12(b)(6) [failure to state a claim] and to compel arbitration of the state law claims under an arbitration clause in the Elkins partnership agreement. The district court dismissed the federal claims and ordered arbitration of the state claims.[1]

My first concern with Judge Garth's opinion is that it disposes of Goodwin's complaint by affirming the order of the district court which in granting the motion to dismiss took cognizance of the terms of the partnership agreement even though the agreement was not attached to the complaint. True, the agreement was attached to the motion. However, before the district court could rely on it, it was required by Fed.R.Civ.P. 12(b) to treat the motion as a motion for summary judgment and, ordinarily, give the opposing party an opportunity to respond with any relevant material. This was not done. However, for reasons developed later, I am persuaded that the district court's failure to treat Elkins' mo-

preme Court would hold otherwise, we find no indication that such is the circumstance here. *Waddell II* is wholly consistent with the policy of Pennsylvania, as announced by its Supreme Court, which encourages arbitration. *See Waddell I*, 348 A.2d at 99 (Supreme Court stating that "arbitration is favored by the courts"). In the absence of a starkly defined irregularity of decision, therefore, we decline to hypothesize a disagreement between the Pennsylvania Supreme Court and the state's intermediate appellate court.

We also note that the policy expressed both in *Waddell I* and *Waddell II* favoring arbitration agrees with analogous pronouncements in federal law. In *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967), the Supreme Court held that, under the Federal Arbitration Act, an allegation of *fraud in the inducement of the contract* was properly submitted under that contract's broad arbitration provision, absent a showing that the arbitration clause itself was induced by fraud. *Accord, Merritt-Chapman & Scott Corp. v. Pennsylvania Turnpike Comm'n*, 387 F.2d 768 (3d Cir.1967). Here, Goodwin

does not even challenge the validity of the Elkins Partnership Agreement itself, but merely challenges the manner in which the defendants conducted themselves in carrying out the Agreement's termination provisions. It is clear to us, therefore, that Goodwin's claims would be arbitrable under the Federal Arbitration Act. Although, as we have noted, state law controls here, "[i]n the absence of Pennsylvania authority to the contrary we shall assume that the Pennsylvania courts would take the view adopted by the Supreme Court of the United States." *Merritt-Chapman & Scott*, 387 F.2d at 771.

**24.** Our holding, in affirming the dismissal of Goodwin's securities claims and the arbitration of Goodwin's remaining state law claims, in no way intimates any view with respect to the merits of Goodwin's claims.

**1.** I am doubtful that my colleagues correctly construe the arbitration order as one directing arbitration rather than staying the action pending arbitration.

tion as a motion for summary judgment was harmless error.

Turning to the federal claims, Judge Becker and I are in agreement that we need not decide here whether a general partner's rights and responsibilities under the Pennsylvania Uniform Partnership Act are sufficient to prevent a general partner's interest from being treated as a security for purposes of federal law. Goodwin's partnership interest was a security under *SEC v. Howey*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), if there was an investment contract between Goodwin and Elkins. In their respective opinions, Judge Garth and Judge Becker have summarized the rights and responsibilities of general partners under the Partnership Agreement. Judge Becker and I agree that a general partner with this degree of participation in partnership affairs is not a security holder. *See, e.g., Odom v. Slavik*, 703 F.2d 212, 215 (6th Cir.1983); *Hirsch v. DuPont*, 396 F.Supp. 1214, 1220–21 (S.D.N.Y.1975), *aff'd*, 553 F.2d 750 (2d Cir.1977); *NYSE, Inc. v. Sloan*, 394 F.Supp. 1303, 1314 (S.D. N.Y.1975). I do not consider my conclusion to be inconsistent with the dicta in *Williamson v. Tucker*, 645 F.2d 404, 422–24 (5th Cir.1981), *cert. denied*, 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981).

In *Lino v. City Investing Co.*, 487 F.2d 689, 693 (3d Cir.1973), we held that if an agreement is not on its face an investment contract, and the plaintiff does not allege facts that call into question the substance of the agreement, the plaintiff is not a security holder, as a matter of law. A court's overriding concern, however, is to determine the "economic reality" of the enterprise. *Tcherepnin v. Knight*, 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967). *See SEC v. Aqua-Sonic Products*, 687 F.2d 577, 582–84 (2d Cir.1982) (license agreement is an investment contract where optional management powers described in the agreement are a mere formality and unlikely to be exercised). I turn

to the pertinent allegations in Goodwin's complaint.

Goodwin alleges that:

16. Pursuant to the terms of the Elkins limited partnership agreement, management was vested in Elkins' executive committee, and upon information and belief, many of Elkins' management decisions were made solely by the managing general partner.

17. Despite the fact that certain passive partners, such as Goodwin, were denominated as general partners, the terms of the limited partnership agreement left so little control in the hands of Goodwin and other passive general partners who did not serve on the executive committee, that the arrangement distributed control with respect to those general partners including Goodwin as it did with the limited partners.

The question under *Lino* is whether these allegations point to a significant variance between the terms of the Partnership Agreement and the allocation of management power in fact. Paragraph 16 alleges that the managing partner made many management decisions by himself. It is not clear that this allegation challenges the substance of the Partnership Agreement, which provides that "[t]he Partnership will be managed by the Managing Partner under the supervision of the Executive Committee subject to the approval or decisions of the General Partners." This language would seem to authorize the managing partner to make management decisions.

It is possible to interpret paragraph 16 as an allegation that the managing partner did not in fact respect the terms of the Partnership Agreement and had usurped some unspecified amount of control.[2] Even under this interpretation of paragraph 16, the managing partner's alleged excesses could not convert Goodwin's partnership interest into a security. Goodwin does not allege that he and the other general partners were deprived of the management pre-

---

2. Goodwin's complaint does not specify whether a particular managing partner allegedly exceeded his authority under the Partnership Agreement or whether succeeding managing partners exceeded their authority.

rogatives that the Partnership Agreement grants on its face, including the right to replace the managing partner by majority vote.[3]

The allegations in paragraph 17 of Goodwin's complaint pertain explicitly and exclusively to the allocation of management power pursuant to the terms of the Partnership Agreement. I have concluded above that this allocation of power does not make Goodwin a security holder.

Goodwin argues that he could not control the management of the firm and that he was dissatisfied with management decisions, but an unhappy minority partner does not a security holder make. *See Odom*, 703 F.2d at 215. Goodwin also argues that he was effectively denied access to the information necessary for him to protect his investment because Elkins failed to inform him of the alleged merger negotiations. Although the federal securities laws protect investors by requiring disclosure of certain kinds of information, *see, e.g., Tcherepnin*, 389 U.S. at 336, 88 S.Ct. at 553, the federal securities laws are not properly invoked to protect one general partner from the deceit of his copartners.

Although I would treat the district court's order dismissing Goodwin's federal securities law claims as an order granting summary judgment in favor of Elkins, I would affirm that order, albeit on grounds different from those on which Judge Garth relies. I join in the disposition of the state law claims.

---

3. Under the Partnership Agreement, each general partner votes in proportion to his ownership interest. Limited partners have no voting power, and the Partnership Agreement explicitly prohibits their participation in the management or control of the partnership.

1. The courts are divided on the question whether a plaintiff is required to attach a written contract to a complaint based thereon. *See* 2A J. Moore, *Moore's Federal Practice* § 8.17[6] at 8–184. In this case the partnership agreement was attached as an exhibit to the Rule 12(b)(6) motion.

2. The Ninth Circuit indicated that it would reach that result in *Townsend v. Columbia Oper-*

---

**BECKER, Circuit Judge, concurring:**

I concur in the judgment of the Court, and in all but part III of Judge Garth's opinion. Moreover, I agree essentially with what Judge Garth has written in part III B. My difference with Judge Garth is that I would ground our decision solely upon the terms of the Elkins & Co. Limited Partnership Agreement, to which Goodwin was a signatory, and would not reach the arguments founded upon the Pennsylvania Uniform Partnership Act. Obviously this approach presupposes the view that the partnership agreement is properly before us in the present posture of the case. Judge Garth and Chief Judge Seitz have doubts on this point, but I believe that the agreement is properly before us and hence would dispose of the case on the narrower grounds of the partnership agreement. I will first address the question whether we may consider the agreement, and then its legal effect.

Where, as here, the allegations of a complaint are based on underlying written documents, and the authenticity of those documents is unchallenged, I believe that a court may properly consider those documents on a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), even if the documents are not formally attached to the complaint.[1] A contrary holding would enable plaintiffs to survive a 12(b)(6) motion where the terms of the document on which the claim is based would render the complaint insufficient as a matter of law, simply by refusing to attach the document to the complaint.[2] This is such a case.[3] Accordingly,

---

*ations*, 667 F.2d 844 (9th Cir.1982). In *Townsend*, the court stated that the documents underlying the complaint in that case were "in substance" part of the complaint, even though they were not attached to the complaint. The court in *Townsend* did not, however, need to hold that the underlying documents could be considered on a rule 12(b)(6) motion, because it felt that the notice and opportunity to respond requirements for a summary judgment under Fed.R. Civ.P. 56 had been substantially met.

3. Goodwin, in his complaint, clearly relied on the terms of the limited partnership agreement. *See* ¶¶ 16, 17 of the complaint.

I would hold that where a document is actually and necessarily relied upon in the allegations of a complaint, and its authenticity is conceded, the document may be considered by the court on a motion under Fed.R.Civ.P. 12(b)(6).[4] This approach would enable the district courts to dispose of claims which, in light of the documents on which they are based, are legally insufficient, without the necessity of allowing the extensive discovery generally required before passing on a motion for summary judgment.

I believe that the terms of the Limited Partnership Agreement dispose of Goodwin's securities claims as a matter of law, even if his allegations concerning management of Elkins & Co are accepted as true.[5] In order to prove that his interest was a "security" within the meaning of the securities laws, Goodwin had to show that his interest in Elkins falls within the test announced in *Securities and Exchange Commission v. W.J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), and its progeny.[6] That test basically attempts to separate passive investments from active, participatory interests in businesses. As Judge Garth's opinion points out, the Elkins agreement provides that general partners may participate in the nomination, election, or removal of the Executive Committee and the Managing Partner, that they retain ultimate control through the function of overseeing the decisions of the executive committee and the managing partner, and that they retain power over new admissions to the partnership and over involuntary terminations. I note that, in addition, the agreement provides that "[e]ach partner will devote substantially all of his business time and attention to the business of the partnership" (¶ 7(b)), that partners "will not, during the continuance of the Partnership, carry on or be concerned with or interested in ... any other business or venture other than as herein provided" (¶ 7(c)), and that partnership interests may not be assigned (¶ 22).

These factors, taken together, negate the argument that the interest of partners in the firm was basically a passive investment. As I have noted above, in his complaint in this case Goodwin has relied on the terms of the agreement, actually and constructively, and has not alleged that the provisions referred to above were shams. Under these circumstances, the terms of the agreement conclusively determine that the general partnership interest created thereby is not a security. Goodwin's allegations concerning his non-participation in management therefore fail to state a claim under the securities law, whether or not they are true.

---

**4.** I am buttressed in this holding by the general rule that the interpretation of a written document is a matter of law for purposes of appellate scope of review. *See Emor, Inc. v. Cyprus Mines Corp.*, 467 F.2d 770, 773 (3d Cir.1972). Where the written language of a contract or other document is dispositive of an issue as a matter of law, there is no reason for even the cursory factual discovery and presentation required by Fed.R.Civ.P. 56.

**5.** Because I take this position, I believe that we could dispose of this case on the basis of the agreement even if we had to treat the motion to dismiss as a motion for summary judgment

under Fed.R.Civ.P. 56. Since the partnership agreement renders Goodwin's complaint insufficient as a matter of law, factual proof of the allegations in the complaint would not be "material" to our disposition of the case. Therefore, there was no harm from the district court's failure to give Goodwin an opportunity to present factual rebuttal before granting the motion even if we treat it as one for summary judgment on the basis of legal insufficiency. I understand this to be Chief Judge Seitz's position as well.

**6.** *See* note 4 of Judge Garth's opinion.