**MUTUAL BENEFIT LIFE INSURANCE, COMPANY, Beneficial Life Insurance Company, General American Life Insurance Company, Manufacturers Life Insurance Company (USA), New York Life Insurance Company, Oxford Life Insurance Company and Standard Insurance Company, Plaintiffs,**

v.

**George G. ZIMMERMAN, George G. Zimmerman & Company, Inc., William J. Flynn, Wm. J. Flynn Associates, Inc., Paul J. Bargnesi, Samuel C. Corey, and Consultants & Administrators, Inc., Defendants.**

Civ. A. No. 91–1945 (AJL).

United States District Court, D. New Jersey.

Jan. 8, 1992.

John J. Sheehy, Kenneth L. Miller, Rogers & Wells, New York City, and Marc S. Friedman, Friedman Siegelbaum, Roseland, N.J., for All American Life Ins. Co.

Gerald A. Liloia, Peter C. Harvey, Riker, Danzig, Scherer, Hyland & Perretti, Morristown, N.J., for George G. Zimmerman & Co., Inc., George G. Zimmerman and Hartford Line Slip, Inc., formerly known as Zimmerman Line Slip, Inc.

Hugh P. Francis, Francis & Berry, Morristown, N.J., for William P. Flynn and William J. Flynn & Associates, Inc.

Mark F. Hughes, Jr., Robinson, St. John & Wayne, Newark, N.J., for Consultants & Administrators, Inc., Samuel C. Corey and Paul J. Bargnesi.

Richard K. Willard, Richard H. Porter, John F. Kostyack, Steptoe & Johnson, Washington, D.C., and Robert E. Bartkus, Pinto, Rodgers & Kopf, Morristown, N.J., for Mut. Ben. Life Ins. Co., Beneficial Life Ins. Co., General American Life Ins. Co., The Mfrs. Life Ins. Co. (USA), New York Life Ins. Co., Oxford Life Ins. Co., and Standard Ins. Co.

Michael E. Donovan, Sills Cummis Zuckerman Radin Tischman Epstein & Gross,

P.A., Newark, N.J., for Integrated Resources Life Ins. Co.

Richard M. Eittreim, McCarter & English, Newark, N.J., for Provident Mut. Ins. Co. of Philadelphia.

Reid Evers, Transamerica Occidental Life Ins. Co., Los Angeles, Cal., and Donald Horowitz, Hackensack, N.J., for Transamerica Occidental Life Ins. Co.

Robert A. Knuti, Lord, Bissel & Brook, Chicago, Ill., and William B. McGuire, Tompkins, McGuire & Wachenfeld, Newark, N.J., for Sec. Ben. Life Ins. Co.

## OPINION

LECHNER, District Judge.

This is a consolidated action (the "Consolidated Action") of four actions, the first, (the "*All American* Action"), brought by plaintiff All American Life Insurance Company ("All American") against Beneficial Life Insurance Company ("Beneficial"), General American Life Insurance Company ("American Life"), Maine Fidelity Life Insurance Company ("Maine Fidelity"), Mutual Benefit Life Insurance Company ("Mutual"), Oxford Life Insurance Company ("Oxford Life"), New York Life Insurance Company ("New York Life"), Provident Mutual Life Insurance Company of Philadelphia ("Provident Mutual"), Integrated Resources Life Insurance Company ("Integrated Resources"), Security Benefit Life Insurance Company ("Security Benefit"), Standard Insurance Company ("Standard Life"), and Transamerica Life Insurance Company ("Transamerica") (collectively,

the "*All American* Action Defendants"); the second, (the "*Security Benefit* Action"), is brought by Security Benefit against All American, Bankers Security Life Insurance Society ("Bankers Security"), Business Men's Assurance Company ("BMA"), Consultants and Administrators ("C & A"), United Olympic Life Insurance Company ("United Olympic"), William J. Flynn ("Flynn"), Wm. J. Flynn & Associates ("Flynn & Associates"), George G. Zimmerman ("Zimmerman") and George G. Zimmerman & Company, Inc. ("Zimmerman & Co.") (collectively, the "*Security Benefit* Action Defendants"); the third, (the "*Mutual* Action"), brought by plaintiffs Mutual, Beneficial, American Life, Manufacturers Life, Oxford Life, New York Life and Standard Insurance (collectively, the "*Mutual* Action Plaintiffs") against defendants Zimmerman, Zimmerman & Co., Flynn, Flynn & Associates, Paul J. Bargnesi ("Bargnesi"), Samuel C. Corey ("Corey"), C & A, All American and BMA (collectively, the "*Mutual* Action Defendants"); and the fourth, (the "*United Olympic* Action"), brought by United Olympic and Bankers Security against Transamerica.

Currently before the court are motions brought by Zimmerman & Co., and by Flynn and Flynn & Associates (collectively, the "Movants")[1] to compel arbitration by the *Mutual* Plaintiffs and the *All American* Action Defendants and to stay the discovery and proceedings of the Consolidated Action pending resolution of the arbitration.[2] Jurisdiction is alleged pursuant

---

1. Zimmerman Line Slip, Inc. has signed the reply brief submitted by Zimmerman Inc. Zimmerman Line Slip was not, however, a signatory to the Notice of Motion, filed 16 September 1991. Nor has Zimmerman Line Slip filed a notice of motion to join the pending motion. Accordingly, Zimmerman Line Slip is not a movant to this motion. This fact was confirmed at oral argument when the parties were asked who was involved in the motions before the court. Oral Arg. Tr. at 5.

Nor is Zimmerman a party to this motion. As mentioned, at oral argument the parties affirmatively stated the Movants were Zimmerman & Co., Flynn and Associates and Flynn. *Id.* The moving papers were prepared over a period of four months; the moving brief is dated 28 June 1991 and a dispositive moving package was not

filed until 16 September 1991. At no time did Zimmerman attempt to join this motion.

2. In support of these motions, the following has been submitted: Memorandum of Law of Defendant George G. Zimmerman & Company, Inc. in support of Motion to Consolidate *All American Life v. Beneficial Life*, 9 Civ. 1789 with this action, to Compel Arbitration, and to Stay Consolidated Action (the "Zimmerman & Co. Brief"); Brief on Behalf of Defendants William J. Flynn and Wm. J. Flynn & Associates, Inc. in Support of Motion to Compel Arbitration and to Stay Proceedings (the "Flynn Brief"); Affidavit of George Zimmerman (the "Zimmerman Aff."); Affidavit of Charles J. Sharkey (the "Sharkey Aff."); Affidavit of Peter C. Harvey (the "1st Harvey Aff."); Supplemental Affidavit of Peter

to 28 U.S.C. § 1331; 18 U.S.C. § 1964 and 28 U.S.C. § 1367, supplemental (pendant) jurisdiction. For the reasons set forth below the motions to compel arbitration and to stay the Consolidated Action are denied.

*Facts*

*Reinsurance Industry*

Reinsurance is a secondary level of insurance of risks. Pursuant to a reinsurance contract, primary insurers cede some or all of the risks they have insured to reinsurers. In exchange, the reinsurers receive a percentage of the premiums collected by the primary insurers. Zimmerman & Co. Brief, 1; Zimmerman Aff., Ex. D, 5; First Amended Complaint in the *Security Benefit* Action, filed 29 October 1991 (the *"Security Benefit* Complaint"). Reinsurers may join pools, otherwise known as line slips. Zimmerman & Co. Brief, 1. A reinsurance pool has a manager, whose relationship with the reinsurance pool members is governed by a management agreement. *Id.; Security Benefit* Complaint, ¶ 23. Under the terms of the management agreement, each member of the reinsurance pool agrees to accept a certain portion of all risks accepted by the reinsurance pool manager. *Id.,* ¶ 24.

Reinsurance relationships are frequently established through "reinsurance brokers" or "reinsurance intermediaries." *Id.,* ¶ 19. A reinsurance intermediary advises his or her client of the best available reinsurance program and places the client with the reinsurers at competitive prices and terms. *Id.* The manager of a reinsurance pool contracts with reinsurance intermediaries to bring together primary insurers and reinsurers. Zimmerman & Co. Brief, 1–2. Primary insurers enter a reinsurance contract with the reinsurance pool.

Retrocessionaires represent the third level of insurers. Reinsurers retrocede a portion or all of the risks they incur to retrocessionaires. *Id.* Retrocessionaires may join retrocessionaire pools which function the same as a reinsurance pool. *Id.* It is the custom of the reinsurance and retrocession industry that the parties to reinsurance agreements owe one another a duty of utmost good faith. *Security Benefit* Complaint, ¶ 17.

Insurance packages may be marketed, sold and administered by insurance company employees or third party administrators. *Id.,* ¶ 28. A third party administrator receives commissions on the insurance packages it administers.

*1988 Reinsurance Pool*

Zimmerman Line Slip, Inc. ("Zimmerman Line Slip")[3] is a reinsurance pool incorporated under the laws of New Jersey. Second Amended Complaint of the *Mutual* Action Plaintiffs, ¶¶ 8, 23 (the *"Mutual* Complaint"). Its underwriting year is organized by calendar year. Zimmerman Aff., ¶ 3. For the 1988 underwriting year

C. Harvey (the "2d Harvey Aff."); Reply Memorandum of Law of Third–Party Defendant Zimmerman Line Slip, Inc. and George G. Zimmerman & Company, Inc. in Support of Motion to Compel Arbitration and Stay Consolidated Action (the "Zimmerman & Co. Reply Brief"); Reply Brief on Behalf of Defendants William J. Flynn and William J. Flynn & Associates, Inc. in Further Support of Motion to Compel Arbitration and to Stay Proceedings (the "Flynn Reply Brief").

In opposition to these motions, the following has been submitted: Memorandum of Law in Opposition to Motions to Compel Arbitration and to Stay Consolidated Action (the "Mutual Opp."); Affidavit of Kent H. Cannon (the "Cannon Aff."); Certification of Richard H. Porter (the "1st Porter Certif."); Supplemental Certification of Richard H. Porter (the "2d Porter Certif."); Plaintiff All American Life Insurance Company's Memorandum of Law in Opposition to Motions to Stay the *All American* Action Pending Arbitration between Zimmerman Line Slip, Inc. and the Reinsurers (the "All American Opp."); Affidavit of Wayne P. Boshka (the "Boshka Aff."); Affidavit of Kenneth L. Miller (the "Miller Aff."); Response to Motions to Compel Arbitration and Stay Proceedings (the "Transamerica Opp."); Security Benefit Life Insurance Company's Concurring Memorandum in Opposition to Motion to Compel Arbitration and to Stay Consolidated Action Filed on Behalf of George G. Zimmerman & Company, Inc. (the "Security Opp."); Integrated Resources Life Insurance Company Letter, dated 13 August 1991; and Provident Mutual Life Insurance Letter, dated 4 September 1991.

The parties have also submitted the transcript of oral argument held on 25 October 1991 (the "Oral Arg. Tr.").

3. Zimmerman Line Slip is currently known as Hartford Line Slip, Inc. Zimmerman Aff., ¶ 1.

(the "1988 Pool"), Zimmerman Line Slip had thirteen reinsurance companies as members (the "1988 Pool Members"), seven of which are the *Mutual* Action Plaintiffs and eleven of which are the *All American* Action Defendants. *Id.* Zimmerman Line Slip executed a management agreement (the "Management Agreement") with each of the 1988 Pool Members. *Mutual* Complaint, ¶ 25. The Management Agreement governs the authority and responsibility of Zimmerman Line Slip with respect to the 1988 Pool Members. Zimmerman Aff., ¶ 4. The 1988 Pool Members agreed to accept the following percentage share in the 1988 Pool:

| | | | |
|---|---|---|---|
| Mutual | 9.09% | *,[4] | **[5] |
| Beneficial | 6.82% | *, | ** |
| American Life | 15.15% | *, | ** |
| Manufacturers Life | 10.00% | * | |
| New York Life | 9.09% | * | |
| Oxford Life | 1.51% | *, | ** |
| Standard | 10.00% | *, | ** |
| Security | 12.12% | | ** |
| Transamerica | 4.55% | | ** |
| Integrated Resources | 7.57% | | ** |
| Provident Mutual | 4.55% | | ** |
| Maine Fidelity | 10.00% | | ** |
| U.S. Cap. Ltd. ("U.S. Cap.") | 9.55% | | **[6] |

*Mutual* Complaint, ¶¶ 1–7; Zimmerman Aff., ¶¶ 9–10. Each 1988 Pool Member received a pro rata share of premiums from the primary insurer. *Id.*, ¶ 8. In turn, each 1988 Pool Member agreed to pay claims submitted by the primary insurer according to their agreed upon share. *Id.* The Management Agreement contained an arbitration clause which provides:

*As a condition precedent to any right of action hereunder,* any dispute or difference hereafter *arising with reference* to the *interpretation, application, or other effect of this Agreement* or any part hereof, ... *shall be referred to a Board of Arbitration....*

*Id.,* Ex. A., Art. X (emphasis added).

Article IV of the Management Agreement provides:

[Zimmerman Line Slip] shall conduct and manage said Reinsurance business according to its complete discretion, but in a manner consistent with the terms of this Agreement. Any claims or suits as a result of [Zimmerman Line Slip's] acts or conduct or negligence shall solely be the liability of [Zimmerman Line Slip].

*Id.,* Art. IV. Article IV further provides Zimmerman Line Slip "shall have full power and authority ... to negotiate, underwrite ... and accept Reinsurance Contracts ... in the [reinsurer's] name and behalf permitted by Zimmerman Line Slip Charter...." *Id.,* Art. IV(a).

Article XI, entitled "Limits and Class of Business Authority" provides:

The [reinsurer] does hereby authorize [Zimmerman Line Slip] to accept up to $3,300,000 on any one Individual and $33,000,000 in the Aggregate in respect of the following classes of business:

Accident Death Benefit Reinsurance (Individual);

Accident Death & Dismemberment Insurance (Group);

Accidental Death & Dismemberment Insurance (Voluntary Accident);

Blanket Accident Insurance;

Catastrophe Cover (Industrial Aid–Seat Accident Insurance);

Catastrophe Cover (Target Risk–Known Accumulations);

Catastrophe Cover (Excess of Loss–Unknown Accumulations);

Dental, Hearing and Vision and Prescription Drug;

Disability Insurance (Individual);

Disability Insurance (Group);

Non–Standard Business;

Special Groups Reinsurance;

Special Hazards Insurance;

Special Hazards Insurance (Race Drivers);

Sports Accident (Professional Sports Teams);

Special Hazards (Aviation);

---

**4.** * designates a *Mutual* Action Plaintiff.

**5.** * * designates an *All American* Action Defendant.

**6.** Pursuant to a separate agreement, U.S. Cap. holds 5% of shares of BMA and 4.55% of shares of State Mutual Life Assurance Company of America ("State Life"). Zimmerman Aff., ¶ 10.

Special Hazards (War Risks);
Student Accident Medical Reinsurance;
Trip Accident Insurance.

*Id.,* Art. XI.

Zimmerman is the manager and principal owner of Zimmerman Line Slip. *Mutual* Complaint, ¶ 8. Zimmerman is also the authorized agent for Zimmerman Line Slip under the Management Agreement. Zimmerman Aff., ¶ 17. Zimmerman & Co. is an insurance and reinsurance intermediary. *Mutual* Complaint, ¶ 9. Zimmerman & Co. is a Delaware corporation with its principal offices in New Jersey. *Id.* Zimmerman is a majority shareholder in Zimmerman & Co. *Id.*

C & A is a third party administrator of insurance programs and has its principal place of business in Ohio. *Id.,* ¶ 12. Bargnesi is the president and a principal owner of C & A. *Id.,* ¶ 13. Corey is the Vice president and a principal owner of C & A. *Id.* ¶ 14. C & A marketed and administered group medical insurance coverage of policies issued by primary insurers. *Id.,* ¶ 61.

The *Mutual* Complaint alleges Zimmerman, on behalf of the 1988 Pool, arranged with C & A to enter a series of medical risk reinsurance agreements. *Id.,* ¶¶ 26–27. Flynn is an insurance agent and insurance and reinsurance broker or intermediary. *Id.,* ¶ 32. Zimmerman was assisted by Flynn, Flynn & Associates and Zimmerman & Co. as insurance intermediaries. *Id.* Commissions were generated at several levels of these transactions. First, the insured paid the third party administrator the premiums on the policies. *Security Benefit* Complaint, ¶ 45. The third party administrator, after taking a commission and fees, paid the primary insurer the premiums. *Id.* The primary insurer received a fronting fee and the balance of the premium was sent to Zimmerman & Co. as the intermediary for the Zimmerman Line Slip pool manager. *Id.* The pool manager, af-

ter retaining a commission, paid the remainder of the premium to the reinsurance pool. *Id.*

Zimmerman entered reinsurance obligations under three reinsurance agreements: the Reinsurance Agreement between Zimmerman Line Slip and All American (the "All American Reinsurance Agreement"),[7] the Reinsurance Agreement between Zimmerman Line Slip and United Olympic and Bankers Security (the "United Olympic Reinsurance Agreement") and the Reinsurance Agreement between Zimmerman Line Slip and Bradford/Lamar Life Insurance Company ("Bradford/Lamar") [8] (collectively, the "Reinsurance Agreements"). Zimmerman Aff., ¶ 11.

Under the Reinsurance Agreements the 1988 Pool agreed to reinsure non-accident medical business known as multiple employer trust business (the "MET Business"). *Id.,* ¶ 15. Zimmerman states that prior to entering the Reinsurance Agreements each Reinsurer received all relevant information. *Id.,* ¶ 15. Kent H. Cannon ("Cannon"), Vice President and Actuary of Beneficial, states, however, he never received advance notice of Zimmerman's intent to underwrite MET Business. Cannon Aff., ¶ 6. Zimmerman contends he never misrepresented any matter to the 1988 Pool Members. Zimmerman Aff., ¶ 17.

MET Business is not listed under Article XI of the Management Agreement. Zimmerman Aff., Ex. A. MET Business is authorized under the Zimmerman Line Slip Charter. *Id.,* ¶ 16. Prior to 1988 Zimmerman Line Slip did not reinsure any non-accident medical business for the accounts of pool subscribers. Cannon Aff., ¶ 4. Nor did any brochures presented to Beneficial contain references to MET Business. *Id.* Cannon states that at the time the Reinsurance Agreements were entered Beneficial was not informed Zimmerman Line Slip was reinsuring one hundred per-

---

**7.** The All American Reinsurance Agreement was executed on 22 March 1989, to be effective retroactively as of 1 July 1988. Boshka Aff., ¶ 3. The All American Reinsurance Agreement was to run continuously until 31 December 1991. *Id.*

**8.** All American, United Olympic, Bankers Security and Bradford/Lamar will be referred to collectively as the "Ceding Companies."

cent of the MET Business and the Ceding Companies were retaining none of the risks. *Id.*, ¶ 8.

Zimmerman contends that at the time the Reinsurance Agreements were entered MET Business was profitable. Zimmerman Aff., ¶ 18. Beneficial disagrees with Zimmerman's statement that MET Business was profitable. Cannon Aff., ¶ 10. Cannon states profitability cannot be determined solely by considering whether premium receipts exceed paid claims.[9] *Id.* Around September 1989, several of the 1988 Pool Members learned that Zimmerman had accepted MET Business. *Mutual* Complaint, ¶ 29. Some of the 1988 Pool Members decided not to accept new MET Business and asked Zimmerman to allocate the MET Business reinsurance risk to another entity. Zimmerman Aff., ¶ 18.

Cannon states he was first made aware the 1988 Pool had reinsured MET Business in September 1989. Cannon Aff., ¶ 7. Beneficial received a letter from Zimmerman recommending that the MET Business be transferred to another reinsurance pool, Managed Medical Benefit Risk Corporation ("Medical Benefit Risk"). *Id.* Zimmerman, thereafter, retroceded the 1988 Pool's MET Business to Medical Benefit Risk. Zimmerman Aff., ¶ 19. Zimmerman brokered the retrocession through Flynn and Flynn & Associates. Flynn was the retrocessionaire pool manager for Medical Benefit Risk. Zimmerman Aff., ¶ 19. Although the 1988 Pool Members were still liable under the Reinsurance Agreements for any MET Business risks, Medical Benefit Risk agreed to assume responsibility for payment of reinsurance claims in exchange for all of the premiums. *Id.*, ¶¶ 19–20. Beneficial, however, received a letter stating the transfer to Medical Benefit Risk was less

than a one hundred percent transfer. Cannon Aff., ¶ 7.

The first dispute regarding the Reinsurance Agreements arose in October 1990. Zimmerman Aff., ¶ 22. In the first quarter of 1990, MET Business claims submitted exceeded the amount of MET Business premiums paid. *Id.* The claim reserve account[10] of Medical Benefit Risk began to diminish during the second quarter of 1990 because of the volume of MET Business claims. *Id.*, ¶ 24. In June 1990 Medical Benefit Risk's reinsurance pool members refused to pay the reinsurance claims as required by the Retrocession Agreement with Zimmerman Line Slip. *Id.*, ¶ 25. Therefore, Transamerica, All American and United Olympic turned to the 1988 Pool Members for payment under the terms of the Reinsurance Agreements. *Id.*, ¶ 26.

Zimmerman informed the 1988 Pool Members of their obligation to pay the MET Business claims under the Reinsurance Agreements. *Id.*, ¶ 27. Zimmerman then made cash calls, requests for payment pursuant to Article IV of the Management Agreement, to the 1988 Pool Members. *Id.* Several months passed during which Zimmerman Line Slip discussed payments with the 1988 Pool Members. Eleven of the 1988 Pool Members, including the *Mutual* Action Plaintiffs and the *All American* Action Defendants (collectively the "Reinsurers"), refused to pay the MET Business claims. *Id.*

On 30 November 1990 the 1988 Pool Members executed an agreement with Bradford/Lamar to terminate the MET Business reinsurance obligations as of 28 February 1991 or as soon as a substitute reinsurer was found.[11] *Id.*, ¶ 28. In February 1991, nine of the 1988 Pool Members,

---

**9.** Cannon states that the profitability of a specific risk must be determined in light of the cash flow, premiums due and unpaid, premiums paid in advance, expenses due and accrued and whether a claim reserve has been established and deducted for claims incurred but not paid. Cannon Aff., ¶ 10. A claim reserve consists of "a reserve for claims which have been reported and not paid, and a reserve for claims which have been incurred but not reported." *Id.* The claims reserves are required to be established

on the statutory annual statements filed by insurance companies. *Id.*

**10.** A claim reserve account contains the premiums received from ceding companies for specific business and is used to pay future claims submitted. Zimmerman Aff., ¶ 24.

**11.** U.S. Cap. was the only 1988 Pool Member who did not join in the Bradford/Lamar settlement. Zimmerman Aff., ¶ 28.

including the Reinsurers, settled with United Olympic. *Id.* ¶ 29. As of this date, All American has not settled any claims with the 1988 Pool Members. *Id.,* ¶ 30. Only U.S. Cap. has paid claims on MET Business to All American.[12] *Id.,* ¶ 31. Zimmerman has continued to make cash calls on behalf of Zimmerman Line Slip with respect to All American's MET Business claims. *Id.,* ¶ 32.

### All American Action

On 29 April 1991 All American filed a complaint in this court against eleven of the thirteen 1988 Pool Members.[13] *Id.,* ¶ 33, Ex. C, 4 (the *"All American* Complaint"). Count One of the *All American* Action is for breach of contract. *All American* Complaint, 8. The All American Reinsurance Agreement identified each of the 1988 Pool Members as subscribers to liability created thereby. *Id.,* ¶ 21. The All American Reinsurance Agreement authorized Zimmerman Line Slip to accept or reject reinsurance coverage for medical insurance policies which All American proposed to cede to the 1988 Pool. *Id.,* ¶ 24.

The All American Reinsurance Agreement authorized All American to make cash calls through Zimmerman Line Slip when the claims attributable to the reinsured policies exceeded the amount of the premiums collected by All American. *Id.,* ¶ 27. All American made seven cash calls beginning September 1990 through April 1991 and has not received payment from the *All American* Action Defendants. *Id.,* ¶¶ 28–35. The *All American* Action Defendants have refused to pay the outstanding cash calls. *Id.,* ¶ 36. As a result of the *All American* Action Defendants' refusal to pay the MET Business claims, All American has suffered losses during the period beginning September 1991 and ending May 1991 in an amount of $7,199,023.84. Boshka Aff., Ex. A. During June 1991, All American suffered additional losses in the amount of $417,731.70. *Id.,* ¶ 4. All American seeks contract damages and declaratory relief under the All American Reinsurance Agreement. *Id.,* ¶¶ 38–42.

In Count Three of the *All American* Complaint, All American asserts a breach of duty of fair dealing and good faith. *Id.,* ¶¶ 43–46. All American alleges the 1988 Pool Members owed it "the highest duty of fair dealing and utmost good faith in connection with all aspects of their reinsurance relationship." *Id.,* ¶ 44.

The *All American* Action Defendants assert affirmative defenses and counterclaims against All American. The affirmative defenses asserted are as follows: All American knew or should have known Zimmerman Line Slip did not have authority to bind the 1988 Pool Members for MET Business; Zimmerman Line Slip did not have authority to bind the 1988 Pool Members to MET Business, consequently, the MET Business risks ceded to Zimmerman Line Slip did not give rise to liability; and All American aided and abetted Zimmerman's scheme to defraud the 1988 Pool Members. Answer, filed 14 June 1991, by Mutual, Beneficial, American Life, Maine Fidelity, New York Life, Oxford Life and Standard, (the "Mutual Answer"), ¶¶ 31–38; Integrated Resources Answer, filed 24 June 1991 (the "Integrated Resources Answer"), 4–7; Answer and Separate Defenses, filed 28 June 1991, by Provident Mutual (the "Provident Mutual Answer"), 4–5; Answer, filed 2 July 1991, by Security Benefit (the "Security Benefit Answer"), 8–11; Answer, filed 9 August 1991, by Transamerica (the "Transamerica Answer"), 13–15. As counterclaims, the All American Defendants assert the following: breach of fiduciary duty of good faith and fair dealing arising from the All American Reinsurance Agreement and tortious interference with fiduciary relationships. Mutual Answer, ¶¶ 39–46; Security Benefit Answer, 11–12; Inte-

---

12. As of 4 September 1991 U.S. Cap. has paid $4,326,957.64 in MET Business claims to the Ceding Companies. This represents a $2.2 million net loss to U.S. Cap. on the MET Business accepted by the 1988 Pool. Sharkey Aff., ¶ 5. Zimmerman is a majority owner of U.S. Cap. *Id.,* ¶ 4.

13. All American has not sued BMA or State Mutual Life Assurance Company of America because they have not contested their liability under the Reinsurance Agreement. All American Complaint, ¶ 16.

grated Resources Answer, 7–9; Transamerica Answer, 15–21.

Transamerica also asserted cross-claims against the 1988 Pool Members for breach of fiduciary duties and tortious interference with fiduciary relationships. *Id.*, 21–27. In addition, Transamerica filed a third party complaint for indemnification against Zimmerman Line Slip, Zimmerman, Flynn, Flynn & Associates, C & A, BMA, State Mutual Life Assurance Company of America ("State Mutual") and Medical Benefit Risk. *Id.* The third party complaint is based on allegations of breach of contract, breach of fiduciary duty, tortious interference with fiduciary duties, conspiracy to tortiously interfere with fiduciary duties and breach of fiduciary duty to indemnify. *Id.*

Document production in the *All American* Action has begun. Miller Aff., ¶¶ 4–6. All American and the *All American* Defendants have responded to interrogatories. *Id.*, ¶ 5. The proceedings are at a stage to begin depositions. *Id.*, ¶ 7. The *All American* Action was consolidated with the present action on 15 July 1991. Order, filed 15 July 1991 (the "*All American* Consolidation Order"). The *All American* Consolidation Order did not stay discovery of the *All American Action. Id.*

### Security Benefit Action

On 3 May 1991 Security Benefit, a 1988 Pool Member, filed a complaint in the United States District Court for the District of Kansas.[14] Security Benefit alleges it is not liable for the MET Business claims with which it has been charged. *Security Benefit* Complaint, ¶ 13. Security Benefit alleges it did not voluntarily accept or ratify any contractual obligation for MET Business. *Id.*, ¶¶ 48, 65. It alleges any contractual obligation arose from a deceptive scheme implemented by the *Security Benefit* Action Defendants. Security Benefit avers the *Security Benefit* Action Defendants "had no reasonable expectation of there being an underwriting profit from this business, but they wanted ... to generate fees and commissions for themselves without regard to huge and unmanaged risks

they sought to transfer to Security Benefit." *Id.*, ¶¶ 42–46.

Security Benefit alleges BMA participated in the scheme to generate brokerage income for Zimmerman & Co., even though BMA was aware Zimmerman had no authority to accept MET Business. *Id.*, ¶ 60. Security Benefit alleges the Reinsurance Agreements identify the 1988 Pool Members as reinsurers, but the contract addenda relating to various insurance policies are not signed by Zimmerman Line Slip. The contract addenda are signed by Zimmerman & Co. *Id.*, ¶¶ 49, 57. Security Benefit further alleges United Olympic, Bankers Security and All American were aware Zimmerman Line Slip was not authorized to accept MET Business. *Id.*, ¶¶ 48, 58.

Security Benefit alleges Zimmerman and Flynn deceived Security Benefit of the nature and volume of unauthorized business accepted by Zimmerman Line Slip. *Id.*, ¶¶ 91, 96, 100. Security Benefit contends it never ratified any MET Business accepted by Zimmerman Line Slip. *Id.*, ¶ 64. Security Benefit alleges it was further deceived by Zimmerman when he agreed to arrange a retrocession with Medical Benefit Risk of the MET Business. *Id.*, ¶ 40.

In Count One of the *Security Benefit* Action, Security Benefit seeks rescission of the All American Reinsurance Agreement on the ground that All American breached its duty of "utmost good faith and full and fair disclosure of all material facts." *Id.*, ¶ 67. Security Benefit alleges All American had a duty to disclose the nonprofitability of the MET Business, that Flynn and Flynn & Associates were working on All American's behalf and that All American had delegated its duty of proper underwriting, rating, analysis and management to C & A, Flynn and Flynn & Associates. *Id.*, ¶ 68. Count Two seeks rescission of the United Olympic Reinsurance Agreement on the ground that United Olympic breached its duty of utmost good faith. *Id.*, ¶ 73. Security Benefit alleges United Olympic engaged in conduct similar to that alleged against All American. *Id.* Counts Three

---

**14.** Security Benefit amended its complaint on 29 October 1991. *Security Benefit* Complaint.

and Four seek a declaratory judgment against All American and United Olympic. *Id.*, ¶¶ 77–87.

Count Five alleges a breach of fiduciary duty against Zimmerman because he accepted MET Business he was not authorized to underwrite and he failed to disclose its nonprofitability. *Id.*, 90–91. Count Six asserts a breach of fiduciary duty against Flynn and Zimmerman. *Id.*, ¶¶ 93–97. Count Seven alleges fraud against Zimmerman, Zimmerman & Co., Flynn, Flynn & Associates and C & A. *Id.*, ¶¶ 98–99. Count Eight is a claim for fraud against BMA. *Id.*, ¶¶ 102–104. Count Nine alleges conspiracy to defraud the 1988 Pool Members against Zimmerman, Flynn, Flynn & Associates, C & A and BMA. *Id.*, 109–110. Count Ten seeks equitable relief against Flynn & Associates with respect to premiums received by Flynn & Associates. *Id.*, ¶ 113.

In July 1991 the District Court for the District of Kansas transferred the *Security Benefit* Action to this court. On 1 August 1991, the *Security Benefit* Action was consolidated with the *Mutual* Action. Order, filed 1 August 1991.

*Mutual Action*

On 14 May 1991 the *Mutual* Action Plaintiffs filed a complaint in this court. This action was amended on 15 August 1991 and again on 29 October 1991 by the *Mutual* Complaint. The factual allegations of the *Mutual* Complaint are as follows. Zimmerman & Co., Flynn, Flynn & Associates, ·Bargnesi, Corey and C & A, acting as insurance intermediaries (collectively, the "Intermediaries") persuaded the Ceding Companies to insure MET Business. *Id.*, ¶¶ 22, 27–28. The Ceding Companies were reluctant to insure such risks because of the high-risk nature of the business. *Id.*, ¶ 40. The Intermediaries persuaded the Ceding Companies by assuring them that Zimmerman Line Slip would reinsure the MET Business one hundred percent. *Id.* Zimmerman, on behalf of the 1988 Pool, but without notifying the 1988 Pool Members, reinsured the MET Business by entering the Reinsurance Agreements. *Id.*, ¶ 26.

The *Mutual* Complaint alleges the MET Business was accepted with little or no underwriting and with knowledge it would generate large losses for the 1988 Pool Members while providing substantial commissions and fees for the Intermediaries and Zimmerman. *Id.*, ¶ 34. In 1989 the Reinsurers complained to Zimmerman Line Slip about the MET Business claims. *Id.*, ¶ 29. Zimmerman and Flynn persuaded the Reinsurers to retrocede the MET Business to Medical Benefit Risk. *Id.* Zimmerman did not, however, reveal to the Reinsurers that he was a part owner in Medical Benefit Risk. *Id.* Nor did Zimmerman reveal that many of Medical Benefit Risk subscribers were undercapitalized, off-shore insurance companies. *Id.*, ¶ 30. In addition, Zimmerman falsely stated all foreign members of Medical Benefit Risk were required to deposit a $1 million letter of credit and that Medical Benefit Risk would retain 97.5% of all premiums collected to pay claims. *Id.* After the retrocession, Zimmerman and Flynn expanded and extended the MET Business. *Id.*, ¶ 31.

In Counts One through Four, the *Mutual* Action Plaintiffs assert Federal and New Jersey Racketeering Influenced Corrupt Organizations Act ("RICO") violations and conspiracy to violate RICO claims on the ground that each of the *Mutual* Action Defendants were associated with Zimmerman Line Slip and participated in establishing the Reinsurance Agreements for MET Business. *Id.*, ¶¶ 74–92. Counts Five and Six allege fraud and conspiracy to defraud claims against all the *Mutual* Action Defendants on the ground that Zimmerman made misrepresentations, on behalf of the *Mutual* Action Defendants, to the *Mutual* Action Plaintiffs to conceal the nature of the MET Business. *Id.*, ¶ 93–102.

Count Seven is a claim for breach of common law fiduciary duties against Zimmerman on the ground that Zimmerman was the agent of the *Mutual* Action Plaintiffs under the Management Agreement. *Id.*, ¶ 103–110. The *Mutual* Complaint alleges Zimmerman breached the fiduciary duties of an agent when he executed the Reinsurance Agreements, delegated many

of his duties to Flynn and Flynn & Associates and acted in his own interest rather than in the interest of the 1988 Pool. *Id.* Counts Eight and Nine assert claims for tortious interference with fiduciary relations and conspiracy to do the same against the *Mutual* Action Defendants. The *Mutual* Complaint alleges the Intermediaries were aware of Zimmerman's position as manager of the 1988 Pool and his fiduciary obligations associated with the position. *Id.,* ¶¶ 111–18. Because the Intermediaries assisted Zimmerman, the *Mutual* Complaint alleges they tortiously interfered with his fiduciary obligations. *Id.,* ¶ 118.

*United Olympic Action*

On 25 September 1991 United Olympic and Bankers Security filed a complaint against Transamerica. *United Olympic* Complaint. The *United Olympic* Complaint asserts claims for breach of contract and breach of duty of fair dealing and good faith. *Id.,* 8–10. The *United Olympic* Complaint alleges Transamerica has refused to pay cash calls in the amount of $938,239.45 made under the United Olympic Reinsurance Agreement. *Id.,* ¶ 25.

*Demand for Arbitration*

On 21 June 1991 Zimmerman Line Slip made a demand for arbitration on each 1988 Pool Member pursuant to Article X of the Management Agreement. Zimmerman Aff., ¶ 36. Zimmerman Line Slip demanded arbitration on the following issues:

(1) that [each 1988 Pool Member] is obligated to pay to [Zimmerman Line Slip] immediately upon request all cash calls made upon it by [Zimmerman Line Slip] as provided in the Article V of the Management Agreement;

(2) that [each 1988 Pool Member] is obligated to pay to [Zimmerman Line Slip] management fees, brokerage commissions and all expenses related to claims and losses as provided in Article V of the Management Agreement;

(3) that [each 1988 Pool Member] is obligated to pay all reinsurance claims by making payment solely to [Zimmerman Line Slip] for distribution to the ceding companies having contracts for reinsurance with [Zimmerman Line Slip] for distribution to the ceding companies having contracts for reinsurance with [Zimmerman Line Slip] and that Security Benefit is prohibited from making payment either by co-payee checks or directly to the ceding companies;

(4) that the [Zimmerman Line Slip] pool manager had the authority under the Management Agreement to write medical multiple employer trust ... reinsurance risks for the 1988 ... Pool;

(5) that each [1988 Pool Member] knowingly and voluntarily ratified and accepted the [MET Business] reinsurance risks undertaken by the [1988 Pool];

(6) that each [1988 Pool Member] has the obligation to pay all [MET Business] claims submitted by the ceding companies in an amount equal to its [percentage] share of the [1988 Pool];

(7) that each [1988 Pool Member] is precluded under Article IV of the Management Agreement from commencing or maintaining a civil action against any entity or person, including [Zimmerman Line Slip], arising out of the acts or conduct of any officer or employee of [Zimmerman Line Slip] relating to the reinsurance business of the [1988 Pool];

(8) that each [1988 Pool Member] is obligated to reimburse [Zimmerman Line Slip] for all expenses and damages arising from any and all breaches of the Management Agreement; and

(9) that each Line Slip is obligated to reimburse [Zimmerman Line Slip] for all expenses and damages arising from any and all breaches of the Management Agreement, and a determination of the amount of such expenses and damages.

*Id.,* ¶ 36, Ex. E.

On 13 August 1991, as mentioned, Transamerica consented to arbitration with Zimmerman Line Slip with respect to the issue of whether the MET Business was authorized by the Management Agreement. Transamerica Opp., Ex. A.

*Discussion*

Movants now seek to compel the Reinsurers to arbitration under Article X of the Management Agreement. Zimmerman &

Co. Brief, 1; Flynn Brief, 4. In addition, Movants request a stay of discovery and the proceedings of all aspects of the Consolidated Action pending arbitration. Zimmerman & Co. Brief, 1; Flynn Brief, 4.

Mutual and Security Benefit argue the Movants lack standing to compel arbitration because they are not parties to the Management Agreement. Mutual Opp., 10–15; Security Opp., 4. Mutual further argues the terms of the arbitration clause do not cover the claims in the Consolidated Action. Mutual Opp., 15–16. Lastly, Mutual argues the Consolidated Action should not be stayed pending arbitration by Zimmerman Line Slip. *Id.*, 32–41. Security Benefit also argues, assuming arbitration is compelled, there is no basis to stay the *Security Benefit* Action. Security Opp., 3–4. Security Benefit asserts its litigation involves principals, insurers and reinsurers, and should not be stayed while the reinsurers respond to arbitration demanded by its agent, Zimmerman Line Slip. Security Opp., 3.

Transamerica does not object to a stay of the Consolidated Action pending arbitration to which it has agreed. Transamerica Opp., 5. Transamerica opposes the motion to compel arbitration on the ground that whether Transamerica ratified Zimmerman's acceptance of the MET Business is beyond the scope of the arbitration clause of the Management Agreement. *Id.*, 3. All American opposes the motion to stay the *All American* Action pending arbitration on the ground it would be prejudiced by delay in its efforts to collect its losses. All American Opp., 1–2.

### A. Standing to Compel Arbitration

The Federal Arbitration Act, 9 U.S.C. § 1, *et seq.* (the "FAA") "enables a litigant to invoke the authority of a federal district court in order to force a reluctant party to arbitrate a dispute." *Painewebber Inc. v. Hartmann*, 921 F.2d 507, 510 (3d Cir.1990). Section four of the FAA provides:

A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition ... for an order direct-

ing that such arbitration proceed in the manner provided for in such agreement. 9 U.S.C. § 4.

"When evaluating a motion to compel arbitration, the first determination is whether the parties intended to contract for arbitration." *Britton v. Co–Op Banking Group*, 916 F.2d 1405, 1413 n. 9 (9th Cir.1990); *see also Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 626, 105 S.Ct. 3346, 3353–54, 87 L.Ed.2d 444 (1985); *Conway v. Icahn & Co.*, 787 F.Supp. 340, —— (S.D.N.Y.1990). Although the FAA "was designed to 'overrule the judiciary's longstanding refusal to enforce agreements to arbitrate,'" *Volt Info. Sciences, Inc. v. Board of Trustees*, 489 U.S. 468, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989) (quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 219–20, 105 S.Ct. 1238, 1242, 84 L.Ed.2d 158 (1985)), "the FAA does not confer a right to compel arbitration of any dispute at any time...." *Volt*, 489 U.S. at 474, 109 S.Ct. at 1253.

■ "The right to compel arbitration derives from a contractual right...." *Britton*, 916 F.2d at 1413 (citing *Lorber Indust. v. Los Angeles Printworks Corp.*, 803 F.2d 523 (9th Cir.1986). Therefore, one who is not a party to the contract lacks standing to compel arbitration. *Britton*, 916 F.2d at 1413; *see e.g., Trompeter v. Boise Cascade Corp.*, 877 F.2d 686, 687 (8th Cir.1989); *Lorber Indust.*, 803 F.2d at 525; *Cost Bros. Inc. v. Travelers Indem. Co.*, 760 F.2d 58, 60 (3d Cir.1985).

Nonsignatories of a contract, however, may compel arbitration or be subject to arbitration if the nonparty is an agent of a party or a third party beneficiary to the contract. *See e.g., Arnold v. Arnold Corp.–Printed Communications for Business*, 920 F.2d 1269, 1281 (6th Cir.1990) (corporate officers sued in individual capacity can invoke arbitration clause for conduct that occurred in official capacity); *Barrowclough v. Kidder, Peabody & Co.*, 752 F.2d 923, 938 (3d Cir.1985) (arbitration agreement between employee and employer can be enforced against subentities and representatives of employer); *Scher v.*

*Bear Stearns & Co.,* 723 F.Supp. 211, 216 (S.D.N.Y.1989) ("Acts by employees of one of the parties to a customer agreement are equally arbitrable as acts of the principals as long as the challenged acts fall within the scope of the customer agreement."); *Farmers & Merchants Bank v. Hamilton Hotel Partners, Ltd.,* 702 F.Supp. 1417, 1425 (W.D.Ark.1988) (where agency relationship was established plaintiff cannot disavow it for purposes of arbitration); *Cauble v. Mabon, Nugent & Co.,* 594 F.Supp. 985, 991–92 (S.D.N.Y.1984) (introducing broker deemed to be third party beneficiary to written agreement between investor and clearing broker); *Okcuoglu v. Hess, Grant & Co.,* 580 F.Supp. 749, 751 (E.D.Pa.1984) (introducing broker is deemed to be agent of clearing broker and can enforce arbitration clause between investor and clearing broker).

■ In this case, the Management Agreement provided that, "[a]s a condition precedent to any right of action arising [t]hereunder, any dispute or difference [t]here after arising with reference to the interpretation, application, or other effect of this Agreement or any part [t]hereof, ..., shall be referred to a Board of Arbitration." Zimmerman Aff., Ex. A, Art. X. The parties agree that the Movants are not parties to the Management Agreement. The Movants argue, however, even as non-signatories to the Management Agreement, they have standing to compel arbitration. Zimmerman & Co. Brief, 18–20; Zimmerman & Co. Reply Brief, 6–8; Flynn Reply Brief, 13–15. Zimmerman & Co. asserts it is being sued as an agent of Zimmerman Line Slip and can avail itself of the arbitration clause. Zimmerman & Co. Brief, 19–20 n. 4.

To determine whether an agency relationship exists, courts look to the terms of the agreement and the allegations of the complaint. *See e.g., Arnold,* 920 F.2d at 1281–82; *Britton,* 916 F.2d at 1413; *Scher,* 723 F.Supp. at 216; *In re Oil Spill by the "Amoco Cadiz",* 659 F.2d 789, 795–96 (7th Cir.1981). In this case, the Movants are not defined as agents in the Management Agreement. The Movants' relationship to

the Reinsurers arose because they procured the MET Business which Zimmerman, as the 1988 Pool Manager, accepted under the Reinsurance Agreements. *Mutual* Complaint, ¶¶ 26–27, 31–32, 34, 77–78, 86, 105. The Movants are allegedly responsible for the Ceding Companies' decisions to insure MET Business. *Id.* Flynn is further connected to the 1988 Pool Members because Zimmerman allegedly delegated to Flynn authority concerning the MET Business. *Id.,* ¶ 32.

These allegations, however, do not establish that the Movants, as provided for or contemplated under the Management Agreement, were agents of the 1988 Pool Members or Zimmerman Line Slip. Moreover, the Movants have not presented facts to support their allegations of an agency relationship. *See Smith v. Delaware Valley Auto Spring Co.,* 642 F.Supp. 1112, 1116 (E.D.Pa.1986) (party seeking to rely on agency relationship has burden of establishing it) (citing *N. Rothenberg & Son, Inc. v. Nako,* 49 N.J.Super. 372, 383, 139 A.2d 783 (App.Div.1958)); *Matter of Baby "M",* 217 N.J.Super. 313, 382, 525 A.2d 1128 (App.Div.1987), *aff'd in part rev'd in part,* 109 N.J. 396, 537 A.2d 1227 (1988) (essential element to establish agency relationship is ability of principal to control conduct of agent).

■ The Movants do not demonstrate they are third-party beneficiaries to the Management Agreement. "The crux in third-party beneficiary analysis ... is the intent of the parties." *Mowbray v. Moseley, Hallgarten, Estabrook & Weeden, Inc.,* 795 F.2d 1111, 1117 (1st Cir.1986); *see also Air Master Sales Co. v. Northbridge Park Co-op., Inc.,* 748 F.Supp. 1110, 1117 (D.N.J.1990); *Antinoph v. Laverell Reynolds, Secur., Inc.,* No. 88–3664, 1989 WL 67332, * 2, 1989 U.S. Dist. LEXIS 6799, * 12–13 (E.D.Pa. 19 June 1989).

"The essence of contract liability to a third party is that the contract be made for the benefit of said third party within the intent and contemplation of the contracting parties. Unless such a conclusion can be derived from the contract or surrounding facts, a third party has no

right of action under that contract despite the fact that he may derive an incidental benefit from its performance." *Air Master Sales,* 748 F.Supp. at 1117 (quoting *Gold Mills, Inc. v. Orbit Processing Corp.,* 121 N.J.Super. 370, 373, 297 A.2d 203 (Law Div.1972)).

In this case, the issue is whether the Management Agreement which authorized Zimmerman Line Slip to obtain insurance risks was intended to benefit insurance brokers or intermediaries. "New Jersey courts have been hesitant to imply a third party beneficiary obligation unless the parties explicitly indicate that (1) the claimant is an intended beneficiary of the proposed arrangement and (2) that the claimant will have a direct claim under the contract." *Id.* (citing *Dravo Corp. v. Robert B. Kerris, Inc.,* 655 F.2d 503 (3d Cir.1981)).

In *Air Master Sales,* the contract at issue neither indicated that Air Master Sales was a beneficiary nor did it state that Air Master Sales would have any claims under the contract. *Id.* The contract only mentioned Air Master Sales to the extent the windows required under the contract were to be manufactured by Air Master Sales. *Id.* *Air Master Sales* held the fact that Air Master Sales negotiated with the defendant directly indicated Air Master Sales was not intended to be a third party beneficiary of the contract. *Id.,* 1117–18.

In *Antinoph,* the court found an agreement which made no mention of the defendants and disclosed no benefit on the defendants could not give rise to a third-party beneficiary relationship between the plaintiffs and defendants. 1989 WL 67332, * 4–5, 1989 U.S. Dist. LEXIS 6799, * 14–15.

In this case, the Management Agreement makes no explicit reference to the Movants. An implicit reference is made to the Movants in Article IV which provides:

[Zimmerman Line Slip] shall conduct and manage said Reinsurance business according to its complete discretion, but in a manner consistent with the terms of this Agreement. Any claims or suits as a result of [Zimmerman Line Slip's] acts or conduct or negligence shall solely be the liability of [Zimmerman Line Slip]. . . .

Zimmerman Aff., Ex. A., Art. IV. Implicit in this language is the possibility that Zimmerman Line Slip might employ other intermediary brokers to obtain insurance risks for the 1988 Pool. This vague, indirect reference to third parties, however, does not establish that the parties intended the Movants to be third party beneficiaries of the Management Agreement or that the Movants would have a claim under it.

In *Cauble,* the court held plaintiff was a third-party beneficiary because the plaintiff exercised supervisory powers and had a central position in customer-clearing house relation. 594 F.Supp. at 991. In this case, the Intermediaries may have assisted Zimmerman Line Slip in acquiring risks to reinsure; however, once the Reinsurance Agreements were entered, the Intermediaries had no supervisory control over the Reinsurance Agreements. Moreover, at no time did the Intermediaries have direct contact with the 1988 Pool Members. Because the facts do not reveal an intent to confer a benefit to the Intermediaries, they are at most incidental beneficiaries. *See e.g., Air Master Sales,* 748 F.Supp. at 1117–18; *Houdaille Constr. Materials Inc. v. American Telephone Co.,* 166 N.J.Super. 172, 399 A.2d 324 (1979). The Movants cannot enforce the arbitration clause contained in the Management Agreement.

Movants have failed to establish they are either agents or third-party beneficiaries under the Management Agreement. Accordingly, they lack standing to compel arbitration. Movants contend, however, that the Reinsurers are estopped from resisting a demand for arbitration. Zimmerman & Co. Reply Brief, 6–7. Zimmerman & Co. argues because the relief sought by the Reinsurers turns on a breach of the Management Agreement, the Reinsurers cannot avoid arbitration. *Id.,* 7.

In *McBro Planning & Dev. v. Triangle Elec. Constr. Co.,* 741 F.2d 342 (11th Cir. 1984), Triangle and McBro were not parties to an arbitration clause. Both, however, were parties to arbitration agreements with a hospital for which they were doing

renovations. *Id.,* at 342. McBro sought an order to compel arbitration and a stay of the state court proceedings. The court held, because the alleged tortious conduct had a close relationship to McBro's contractual duties, Triangle was equitably estopped from asserting that the lack of a written arbitration clause precluded arbitration. *Id.,* at 343–44; *see also Hughes Masonry Co. v. Greater Clark County Sch. Bldg.,* 659 F.2d 836, 838–39 (7th Cir. 1981); *A.L. Williams & Assocs., Inc. v. McMahon,* 697 F.Supp. 488, 493–94 (N.D.Ga.1988).

This case is distinguishable from the above-mentioned cases. In those cases, the movant sought to estop opposition to its motion to compel arbitration because the movant was actually being sued for its breach of obligations under an agreement containing an arbitration clause. In this case, the Movants have no contract obligations to the Reinsurers.[15] The allegations against the Movants are not breach of contract claims disguised as torts.

Because the Movants have failed to establish they are agents or third-party beneficiaries to the Management Agreement and the claims against them are not intertwined with an underlying breach of contract on their part, the motions to compel arbitration are denied.

### B. Scope of Arbitration Clause

The Reinsurers argue even if the Movants have standing to compel arbitration, the issues raised in the *Mutual* Complaint and the *All American* Complaint are beyond the scope of the Management Agreement. Mutual Opp., 15; Oral Arg. Tr., 23–24. The Reinsurers argue the arbitration

clause in the Management Agreement applies only to breach of contract claims and not RICO, fraud or other tort claims. Mutual Opp., 15; Oral Arg. Tr., 24.

For purposes of the Reinsurers' argument, it will be assumed that the Movants have standing to compel arbitration or that the proper party moved to compel arbitration. It must be determined whether a part or all of the issues in the *Mutual* Action and the *All American* Action are within the scope of the arbitration clause.[16] If so, it must also be determined whether the *Security Benefit* Action and the *United Olympic* Action involve substantially similar issues necessitating a stay of a part or all of those proceedings pending arbitration.

There is a strong federal policy favoring arbitration agreements.

[Q]uestions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration.... The Arbitration Act establishes that, as a matter of federal law, *any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration,* whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability.

*Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983) (emphasis added); *see also AT & T Technologies v. Communications Workers,* 475 U.S. 643, 648, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1985); *Seltzer v. Klein,* No. 88–6737, 1989 WL 41288,* 3, 1989 U.S. Dist. LEXIS 4270, * 8 (E.D.Pa. 21 April

---

**15.** Of all of the *Mutual* Defendants, only the allegations against Zimmerman could possibly be said to arise from an underlying breach of contract. As previously mentioned, Zimmerman is not among the Movants. *See supra* p. 856 n. 1; Oral Arg. Tr., 5. As manager of Zimmerman Line Slip, Zimmerman has contractual obligations to the 1988 Pool Members.

The Movants had four months to prepare these motions. *See supra,* p. 856, n. 1. Zimmerman never attempted to join the motions and the parties addressed in their briefs that an

agent or a third-party beneficiary of a signatory to an arbitration clause could have standing to compel arbitration. *See* Zimmerman & Co., 19–20 n. 4; Mutual Opp., 14. Accordingly, Zimmerman waived any opportunity to move to compel arbitration and any future motion by Zimmerman will be denied on the basis of estoppel.

**16.** The Movants have only moved to compel the *Mutual* Action Plaintiffs and the *All American* Action Defendants to arbitration, they do not move to compel arbitration in the *Security Benefit* Action or the *United Olympic* Action.

1989). A court must "engage in a limited review to ensure that the dispute is arbitrable." *Painewebber,* 921 F.2d at 511.

The Supreme Court has further stated: [T]here is a presumption of arbitrability in the sense that "[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." *AT & T,* 475 U.S. at 650, 106 S.Ct. at 1419 (quoting *United Steelworkers of America v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582–83, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960)). "In the absence of any express provision excluding a particular grievance from arbitration, ... only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail." *Warrior & Gulf,* 363 U.S. at 584–85, 80 S.Ct. at 1353–54; *see also, AT & T,* 475 U.S. at 650, 106 S.Ct. at 1419; *Genesco, Inc. v. T. Kakiuchi & Co.,* 815 F.2d 840, 846 (2d Cir.1987) (" 'language excluding certain disputes from arbitration must be clear and unambiguous or unmistakably clear' ") (quoting *S.A. Mineracao da Trindade–Samitri v. Utah Int'l, Inc.,* 745 F.2d 190, 194 (2d Cir.1984)). The Third Circuit has held, however, that "positive assurance" does not mean a "flicker of interpretive doubt" can trump a "compelling case for nonarbitrability." *Painewebber,* 921 F.2d at 513.

■ Significantly, the focus is on the "factual allegations in the complaint rather than the legal causes of action asserted." *Genesco, Inc.,* 815 F.2d at 846. If the allegations of the complaint involve matters covered by the parties' underlying agreement, the claims must be arbitrated, regardless of the legal labels ascribed to the claims. *Id.* (citing *Mitsubishi Motors,* 473 U.S. at 627, 105 S.Ct. at 3354). The Third Circuit has stated: "So long as the appellant's claim of arbitrability was plausible, interpretation of the contract should have been passed on to the arbitrator." *Sharon Steel Corp. v. Jewell Coal and Coke Co.,* 735 F.2d 775, 778 (3d Cir.1984);

*see also, Seltzer,* 1989 WL 41288, * 6, 1989 U.S. Dist. LEXIS 4270, * 19 (noting "fine line between a preliminary determination of arbitrability under the [FAA] and intrusion into the appropriate role of the arbitrators.").

■ If the court determines the dispute falls within the scope of the arbitration agreement, it must refer the dispute to arbitration without considering the merits. *Painewebber,* 921 F.2d at 511. This policy eases the workload of the courts without jeopardizing the rights of the parties because "the arbitrators appointed by the parties are presumably specialists, familiar not only with the relevant statutory and common law but also with custom and usage of the trade." *Prudential Lines, Inc. v. Exxon Corp.,* 704 F.2d 59, 63 (2d Cir. 1983); *see also Sharon Steel,* 735 F.2d at 778.

In this case, the validity of the agreement to arbitrate is not in dispute. The issue to be determined is whether the claims, or any part of them, alleged in the *Mutual* Action or the *All American* Action are within the substantive scope of the arbitration clause in the Management Agreement. In terms of the arbitration clause, does the *Mutual* or *All American* Action, or any claim therein, concern a "right of action ... [arising] [t]hereunder," and if so, does it have "reference to the interpretation, application or other affect of the [Management] Agreement ...[?]" Zimmerman Aff., Ex. A, Article X.

In *Prudential Lines,* the court stated two inquiries must be made regarding the scope of an arbitration clause: "(1) is the arbitration agreement broad or narrow?; (2) if narrow, does the dispute involve a 'collateral' agreement?" 704 F.2d at 63. To determine if a clause is narrow, "the tone of the clause as a whole must be considered." *Id.* at 64.

■ If a clause is narrow, the court is the body to determine whether the dispute or the conduct in issue falls within the arbitration clause. *Id.* A dispute is within the scope of a narrow arbitration clause if it does not arise from a collateral agreement. A "collateral agreement" is a sepa-

rate side agreement related to but not arising out of the main agreement. *Id.* If a dispute arises out of the main agreement, even though it requires a determination of subissues, it can be arbitrated. *Id.*

In this case, the Management Agreement provides:

> As a condition precedent to any right of action hereunder, any dispute or difference hereafter *arising with reference to the interpretation, application, or other effect of this Agreement or any part hereof,* whether arising before or after termination of this Agreement, shall be referred to a Board of Arbitration....

Zimmerman Aff., Ex. A., Art. X (emphasis added).

■ The language "any dispute or difference hereafter arising...." is clearly broad language. Oral Arg. Tr., 10. *See e.g., Goodwin v. Elkins & Co.,* 730 F.2d 99, 109–110 (3d Cir.), *cert. denied,* 469 U.S. 831, 105 S.Ct. 118, 83 L.Ed.2d 61 (1984) ("Any controversy arising hereunder" is broad in sweep and covers disputes arising during life and demise of agreement.); *Armada Coal Export, Inc. v. Interbulk, Ltd.,* 726 F.2d 1566, 1568 (11th Cir.1984) ("Any dispute arising during the execution of the Charter Party" is broad arbitration clause.); *Republic of Philippines v. Westinghouse Elec. Corp.,* 714 F.Supp. 1362, 1372 (D.N.J.1989) (language requiring arbitration of "any dispute which may arise between [parties] with respect to this contract" is broad); *Hamilton v. Dean Witter Reynolds, Inc.,* No. 89–351, 1989 WL 89434, * 4, 1989 U.S. Dist. LEXIS 16747, * 10 (W.D.Pa. 19 July 1989) (clause requiring arbitration of "any dispute" is "broad in sweep"); *Ferreri v. First Options of Chicago, Inc.,* 623 F.Supp. 427, 437 (E.D.Pa. 1985) (language requiring "any controversy ... arising out of the undersigned's business or this agreement, whether arising before or after the date hereof" is extremely broad).

The arbitration clause, however, contains words of limitation—"[a]s a condition precedent to any right of action hereunder," and "with reference to the interpreta-

tion, application, or other effect of this Agreement." *See e.g., Republic of Nicaragua v. Standard Fruit Co.,* 937 F.2d 469, 479 (9th Cir.1991) ("arising under" construed to cover narrow range of disputes); *Mediterranean Enters., Inc. v. Ssangyong Corp.,* 708 F.2d 1458, 1464 (9th Cir.1983) ("'arising hereunder' is intended to cover a much narrower scope of disputes, i.e., only those relating to the interpretation and performance of the contract"); *Prudential Lines,* 704 F.2d at 61, 64 (language requiring arbitration of "any dispute ... in respect to the responsibility for repairs, renewals or replacements" is narrow); *Gilbert v. Devco,* No. 87–4797, 1987 WL 18982, * 1, * 2, 1987 U.S. Dist. LEXIS 9929, * 4, * 9 (E.D.Pa. 27 October 1987) (arbitration was confined to narrow instance where arbitration clause stated: "in the event of a deadlock among the General Partners on a particular issue, the issue ... shall be resolved by a binding arbitration"); *Good(e) Business Systems, Inc. v. Raytheon Company,* 614 F.Supp. 428, 429 (W.D.Wis.1985) (arising under construed narrowly to apply to disputes concerning contract itself); *Bell Canada v. ITT Telecommunications Corp.,* 563 F.Supp. 636, 639 (S.D.N.Y.1983) (arbitration clause providing for arbitration of any questions of "additional costs" under the contract shall be arbitrated was "tailored ... provision applicable only in a clearly defined situation," therefore, claims unrelated to additional work performed were beyond scope of arbitration clause).

Accordingly, it appears the arbitration clause in the Management Agreement is not a general broad clause permitting the arbitration of "any" dispute between the parties to the Management Agreement. Significantly, it must first be determined whether a part or all of the *Mutual* Action or the *All American* Action concerns a cause of action arising under the Management Agreement and, if so, whether the right under the Management Agreement has reference to the interpretation, application or other effect of the Management Agreement.

■ Contrary to the Reinsurers' suggestion, a finding that an arbitration clause

is narrow does not alone preclude a dispute from proceeding to arbitration. The second step of the *Prudential Lines* analysis must be considered: does the dispute fall within the narrow language of the arbitration clause. In determining the nature of the dispute, the court is not limited to the legal theories ascribed to the causes of action. *See e.g., Goodwin,* 730 F.2d at 109–110; *Seltzer,* 1989 WL 41288, * 5–6, 1989 U.S. Dist. LEXIS 4270, * 16; *Sea–Land Serv., Inc. v. Sea–Land of Puerto Rico, Inc.,* 636 F.Supp. 750, 752–53 (D.P.R. 1986).

"Whether a particular claim is arbitrable depends not upon the characterization of the claim, but upon the relationship of the claim to the subject matter of the arbitration clause. Were the rule otherwise, a party could frustrate any agreement to arbitrate simply by the manner in which it framed its claims." *Oil Spill by Amoco Cadiz,* 659 F.2d at 794.

In *Seltzer,* the plaintiffs alleged a scheme of fraud by the manager of a partnership. The *Seltzer* court held the "success of the plaintiffs' claims depend [sic] on whether … Klien's expenditures of partnership funds where [sic] authorized and legitimate or bogus and part of a preconceived … fraudulent scheme." 1989 WL 41288, * 6, 1989 U.S. Dist. LEXIS 4270, *16. Because "at least arguably, the alleged misconduct underlying this dispute is governed by contractual rights arising under the partnership agreements and, in part, under the construction contracts" the court compelled arbitration even though the theories of liability were not for breach of contract. *Id.,* 1989 WL 41288, * 7, 1989 U.S. Dist. LEXIS 4270, * 22.

In *Sea–Land Serv.,* the defendants opposed plaintiff's motion to compel arbitration on the ground that the tortious interference claims were outside the scope of the agreement. The court held the arbitration clause providing for arbitration of "any differences and disputes concerning the breach of essential obligations arising out of this Agreement …" did not preclude arbitration of tort claims arising out

of the defendant's obligations under the contract. 636 F.Supp. at 754.

The *Sea–Land* court stated:
Classifying … conduct conclusorily as a tort … is not enough to exclude it from the scope of arbitration, unless defendant established that the arrangement for [the alleged conduct] derived from a separate independent, non-arbitrable agreement or if it showed with sufficient factual allegations that the disconnection occurred in such a manner as to constitute grounds for an independent, actionable tort and not merely the tortious performance of contractual obligations. *Id.; see also Westinghouse Elec.,* 714 F.Supp. at 1374.

In *Goodwin,* the plaintiff filed claims for fraud and breach of fiduciary duty. 730 F.2d at 109–110. The plaintiff was obligated to arbitrate claims for controversies arising under a partnership agreement. *Id.,* at 109. The court stated the "fact that Goodwin's claims are stated in terms of 'fraud' and 'breach of fiduciary duty' does not remove them from the scope of the arbitration agreement." *Id.,* at 110. Because the alleged fraud was committed while a party was executing provisions of the agreement dealing with termination it was a "controversy arising hereunder." *Id.*

### 1. Mutual Action Disputes

█ The *Mutual* Complaint raises issues of fraud, RICO violations, conspiracy and tortious interference. The *Mutual* Action Plaintiffs maintain these claims are outside the scope of the arbitration clause and were chosen because of the difference of the cause of action. Oral Arg. Tr., 26. Specifically, the *Mutual* Action Plaintiffs argue the arbitration clause is applicable to breach of contract claims only. Mutual Opp., 21–22.

In *Mediterranean Enters.,* the court held that "arising under" and "arising hereunder" language in an arbitration clause limits the scope of the clause to disputes relating to the contract itself; "notably, it omits reference to disputes 'relating to' the agreements." 708 F.2d at

1464; *see also Republic of Nicaragua*, 937 F.2d at 479; *Good(e) Business Systems*, 614 F.Supp. at 429. The *Mediterranean Enters.* court held that such language evidenced the parties' intent to arbitrate only those disputes involving the interpretation of the contract and matters of performance. 708 F.2d at 1464. Accordingly, the court held the plaintiff's claims for breach of contract and breach of fiduciary duty were arbitrable, but the claims for conspiracy to induce breach of contract, quantum meruit and conversion were not arbitrable. *Id.* at 1464–65.

The *Mutual* Action Plaintiffs correctly argue the language of the arbitration clause is narrow and the parties did not intend to arbitrate all and any disputes relating to the Management Agreement. Nevertheless, rights of action "hereunder" has not been limited to breach of contract claims only, but rather, courts must analyze the issues raised by each claim to determine whether they involve the interpretation or performance of the contract itself. *See e.g., Id.*, at 1464.

### a. RICO Claims

■ Counts One through Four of the *Mutual* Complaint are claims against all of the *Mutual* Action Defendants for conspiracy to violate or for violations of federal or state RICO laws. With respect to the RICO causes of action, the *Mutual* Complaint alleges that the *Mutual* Action Defendants implemented the United States mails to carry out their scheme to enrich themselves at the expense of the 1988 Pool Members. *Mutual* Complaint, ¶ 78. Specifically, the *Mutual* Complaint alleges Zimmerman, as agent of Zimmerman Line Slip, accepted MET Business which he was not authorized to accept. *Id.*, ¶¶ 26, 77, 82. The *Mutual* Complaint further alleges Zimmerman exceeded his duties as an agent of Zimmerman by concealing and misrepresenting material facts regarding the MET Business. *Id.*, ¶¶ 26, 28–29, 33–34, 59, 77–78, 87.

The *Mutual* Complaint alleges the other *Mutual* Action Defendants were aware Zimmerman was not authorized to accept MET Business and knew Zimmerman had a fiduciary responsibility to the 1988 Pool Members. *Id.*, ¶¶ 28, 41, 55, 64. The *Mutual* Complaint further alleges these defendants misrepresented to the 1988 Pool Members the nature of the MET Business, failed to review or underwrite the MET Business, retroceded the MET Business to Medical Benefit Risk in order to continue to expand their scheme. *Id.*, ¶¶ 31, 35–38, 43–46, 50, 56, 62–63.

The RICO allegations are not a "right of action" arising under the Management Agreement. Indeed, Zimmerman & Co., Flynn, Flynn & Associates, All American, C & A, Bargnesi, Corey and BMA are not bound by the Management Agreement. The RICO claims against these defendants are separate and distinct from the interpretation of or the performance of the Management Agreement. Significantly, the resolution of the RICO claims will require an evaluation of subject matter of the Management Agreement.

Zimmerman, a non-movant, however, is bound by the Management Agreement and as managing agent of the 1988 Pool, he must comply with the terms of the Management Agreement. Nevertheless, the claims for RICO and conspiracy to commit RICO violations are not within the narrow scope of the arbitration clause; they do not arise thereunder. Although a tenuous argument can be made that a RICO claim involves the Management Agreement, but for the Management Agreement Zimmerman would not have been able to accept any insurance risks for the 1988 Pool Members, it fails in this instance. The focus is not on the Management Agreement, but rather Zimmerman's intent and conduct as part of the *Mutual* Action Defendants' complex scheme to enrich themselves to the detriment of the 1988 Pool Members. The RICO claim would remain notwithstanding the Management Agreement or the naming of Zimmerman as a party to the *Mutual* Complaint.

Moreover, resolution of the conspiracy to commit RICO charges will hinge on a determination of whether Zimmerman and the other *Mutual* Action Defendants

agreed to conceal information regarding the profitability of the MET Business and the status of Medical Benefit Risk. Accordingly, the claims based on RICO are predominantly unrelated to the interpretation and performance of the Management Agreement and are not rights of action under it.

### b. Fraud and Conspiracy to Defraud Claims

Counts Five and Six of the *Mutual* Complaint allege the *Mutual* Action Defendants continued their scheme over an extended period of time because they fraudulently concealed and misrepresented the nature, scope and financial condition of the MET Business. *Mutual* Complaint, ¶ 94. The *Mutual* Complaint further alleges that Flynn and Flynn & Associates, to whom Zimmerman had delegated his authority, negotiated the procurement of the MET Business even after having received negative reports from C & A and All American on the financial condition of the MET Business. *Id.,* ¶ 98. In addition, Flynn and Flynn & Associates allegedly conspired with the other *Mutual* Action Defendants to conceal the negative reports from the 1988 Pool Members and instructed a consulting actuary not to communicate with the 1988 Pool Members. *Id.*

These allegations do not involve rights under the Management Agreement. With the exception of Zimmerman, the *Mutual* Action Defendants are not parties to the Management Agreement. The claims against them do not involve rights of action under the Management Agreement. To the extent the claims are against Zimmerman, a non-movant, they too do not involve rights under the Management Agreement. Indeed, allegations of fraudulent misrepresentation require an analysis of Zimmerman's intent and conduct. The Management Agreement relates only peripherally to the outcome of fraudulent misrepresentation claims.

### c. Breach of Common Law Fiduciary Duties

Count Seven of the *Mutual* Complaint is against Zimmerman only for breach of his common law fiduciary duty. The *Mutual* Complaint alleges Zimmerman breached his responsibilities as an agent because he delegated his authority to Flynn and Flynn & Associates, accepted non-profitable MET Business knowing it would generate losses, acted in his own interest over the interest of the 1988 Pool Members, failed to underwrite the MET Business, failed to gather and disseminate to the 1988 Pool Members information regarding the status of Medical Benefit Risk and failed to protect the 1988 Pool Members' interest when he retroceded the MET Business to Medical Benefit Risk. *Mutual* Complaint, ¶¶ 106–110.

The claim for breach of fiduciary duty is within the scope of the arbitration clause.[17] Although the Management Agreement does not identify Zimmerman's fiduciary duties as managing agent of the 1988 Pool, without the Management Agreement Zimmerman would not have a fiduciary relationship. *See e.g., Mediterranean Enters.,* 708 F.2d at 1464; *Willis v. Shearson/American Express, Inc.,* 569 F.Supp. 821, 825 (M.D.N.C.1983). Not only does the cause of action for breach of fiduciary duties constitute a cause of action under the Management Agreement, but the allegations have reference to the interpretation, application or effect of it. Whether Zimmerman exceeded his authority or breached his fiduciary responsibilities involve the application of the Management Agreement; accordingly, Count Seven would be arbitrable.

Nevertheless, the Movants lack standing to compel arbitration in the Consolidated Action; accordingly, the motion to compel arbitration is denied.

### d. Tortious Interference and Conspiracy to Interfere with Fiduciary Relations

Counts Eight and Nine of the *Mutual* Complaint assert claims against the *Mutu-*

---

**17.** As such, the claim would be arbitrable had the party with standing to compel arbitration

moved in this matter. As mentioned, Zimmer-

*al* Action Defendants [18] for tortious interference with fiduciary relations and conspiracy to interfere with fiduciary relations. The *Mutual* Complaint alleges the *Mutual* Action Defendants, with the exception of Zimmerman, were aware of the fiduciary obligations Zimmerman owed to the 1988 Pool Members. *Mutual* Complaint, ¶¶ 113, 117. These defendants allegedly conspired to interfere and did interfere with Zimmerman's fiduciary relations in order to carry out their scheme to enrich themselves at the expense of the 1988 Pool Members. *Id.*, ¶¶ 114, 118.

The claims for tortious interference with fiduciary relations do not arise under the Management Agreement. Although Zimmerman's fiduciary duties are within the Management Agreement, the alleged interference with these relations is not. With the exception of Zimmerman, the *Mutual* Action Defendants are not parties to the Management Agreement, and therefore, their conduct or awareness of Zimmerman's fiduciary duties do not involve or require interpretation of rights under the Management Agreement. *See e.g., Westinghouse Elec.*, 714 F.Supp. at 1374 (breach of fiduciary duty claims based on alleged bribes paid to induce Marcos to interfere with contracting process are not related to performance of contract).

### 2. *All American Action Disputes*

■ The *All American* Complaint asserts causes of action for breach of contract, breach of duty of fair dealing and good faith. *All American* Complaint. In defense of these claims, the *All American* Action Defendants assert that All American knew or should have known neither Zimmerman Line Slip nor Zimmerman was authorized to accept MET Business, consequently, All American assisted Zimmerman's scheme to defraud the 1988 Pool Members and they should not be liable for the MET Business. Mutual Answer, ¶¶ 31–38; Security Benefit Answer, 8–11; Provident Mutual Answer, 4–5; Integrated Resources Answer, 4–7; Transamerica Answer, 13–15.

The *All American* Action Defendants also raise counterclaims asserting breach of fiduciary duty of good faith and fair dealing and tortious interference with fiduciary relationships against All American. Mutual Answer, ¶¶ 39–46; Security Benefit Answer, 11–12; Integrated Resources Answer, 7–9; Transamerica Answer, 15–21.

The Movants argue the claims raised by the *All American* Action must be arbitrated because the *All American* Action Defendants' defense centers on whether Zimmerman was authorized to accept the MET Business. Zimmerman & Co. Brief, 10; Zimmerman & Co. Reply Brief, 13; Oral Arg. Tr., 30. The Reinsurers argue the issue in the *All American* Action is All American's duty of good faith and fair dealing and its obligations under the All American Reinsurance Agreement. Mutual Opp., 30–32; Oral Arg. Tr., 28.

As previously discussed, the arbitration clause is narrow, permitting arbitration of only rights of action under the Management Agreement and of these only issues of "interpretation, application and effect" of the terms of the Management Agreement. *See supra* p. 870–871. As set forth above, rights of action under a contract limits arbitration to those claims dealing with the interpretation or performance of the contract. *Mediterranean Enter.*, 708 F.2d at 1464. It must be determined, therefore, whether the disputes in the *All American* Action fall within the narrow scope of the arbitration clause. *Prudential Lines*, 704 F.2d at 64.

### a. All American Action Claims

Count One of the *All American* Complaint is for breach of the All American Reinsurance Agreement. *All American*

---

man has not moved to compel arbitration in this instance.

**18.** The *Mutual* Complaint states Counts Eight and Nine are against all of the *Mutual* Action Defendants. However, given the nature of the claims, interference with the fiduciary relations of Zimmerman and the 1988 Pool Members, it appears these claims are not against Zimmerman. Counts Eight and Nine are deemed to be against the *Mutual* Action Defendants, except for Zimmerman.

Complaint, ¶ 39. The *All American* Complaint also asserts a claim for breach of duty of fair dealing and good faith on the ground that the *All American* Action Defendants owe a duty of fair dealing and good faith as a result of their reinsurance relationship arising out of the All American Reinsurance Agreement. *Id.,* ¶ 43.

The *All American* Action Defendants' defense to this claim is that Zimmerman was not authorized to accept MET Business and that All American was aware of Zimmerman's lack of authorization. Mutual Answer, ¶¶ 31–32; Security Benefit Answer, ¶¶ 28–29. In addition, the *All American* Action Defendants assert as affirmative defenses the alleged fraud of All American, an alleged illegality and unenforceability of the All American Reinsurance Agreement and estoppel. Mutual Answer, ¶¶ 33–36; Integrated Resources Answer, 4–7. Security Benefit asserts as affirmative defenses to the *All American* Action Zimmerman's dual agency relationship with Zimmerman Line Slip and All American, estoppel, the unenforceability of the All American Reinsurance Agreement against Security Benefit and All American's fraud against the 1988 Pool Members. Security Benefit Answer, ¶¶ 30–35.

These claims are not within the language of the arbitration clause. The arbitration clause only applies to rights of action under the Management Agreement. Counts One through Three of the *All American* Action are brought on the All American Reinsurance Agreement, not on the Management Agreement. Accordingly, they are not claims involving a right of action under the Management Agreement.

The Movants' argument that their defenses bring the claims within the arbitration clause is without merit. Such an argument ignores the limiting language of the arbitration clause which states that it applies only to causes of action under the Management Agreement. Moreover, the defenses to the *All American* Action do not deal solely with rights under the Management Agreement. Indeed, aside from the authorization of Zimmerman Line Slip to accept MET Business, the *All American* Action Defendants' defenses bring into question the enforceability of the All American Reinsurance Agreement, All American's awareness of the language of the Management Agreement, All American's allegedly fraudulent conduct and All American's alleged relationship with Zimmerman. *Id.* The claims in the *All American* Action are non-arbitrable.

b. All American Action Counterclaims

■ The *All American* Action Defendants counterclaim against All American for breach of fiduciary duty of good faith and fair dealing arising out of the All American Reinsurance Agreement. Mutual Answer, ¶¶ 39–40; Transamerica Answer, 15–17; Security Benefit Answer, ¶¶ 37–39. All American is not a party to the Management Agreement. This claim does not fall within the terms of the arbitration clause because it is brought on the All American Reinsurance Agreement and in no way can it be asserted to involve interpretation or performance of the Management Agreement.

In addition, the *All American* Action Defendants counterclaim for interference with Zimmerman's fiduciary relations to the 1988 Pool Members. Mutual Answer, ¶¶ 42–45; Transamerica Answer, 18–20; Security Benefit Answer, ¶¶ 40–42. As mentioned with respect to the *Mutual* Action, claims for interference with fiduciary relations are not arbitrable in this case. All American is not a party to the Management Agreement. Importantly, the dispute is collateral to any rights of action under the Management Agreement. Even assuming a valid cause of action exists under the Management Agreement for breach of contract or breach of fiduciary duty, a claim for interference with fiduciary relations is not inextricably tied to the action under the Management Agreement because it involves different parties, conduct and does not rise and fall with the success of the action under the Management Agreement. *See e.g., Westinghouse Elec.,* 714 F.Supp. at 1374.

For the reasons set forth, the counterclaims raised in the *All American* Action are non-arbitrable.

c. Stay of Consolidated Action

Assuming, for the stay aspect of the motions, the validity of the Movants' standing and the arbitrability of Count Seven of the *Mutual* Action, the Movants argue the Consolidated Action should be stayed pending the outcome of the arbitration. Zimmerman & Co. Brief, 27–33; Zimmerman & Co. Reply Brief, 25–33.

■ "The decision to stay litigation of non-arbitrable claims pending the outcome of arbitration 'is one left to the district court ... as a matter of its discretion to control its docket.'" *UMC Petroleum Corp. v. J & J Enterprises, Inc.*, 758 F.Supp. 1069, 1074 (W.D.Pa.1991) (quoting *Moses H. Cone*, 460 U.S. at 20 n. 23, 103 S.Ct. at 939); *see also Cost Bros.*, 760 F.2d at 60; *Westinghouse Elec.*, 714 F.Supp. at 1375. Central to this determination is whether the arbitrable claims dominate the issues in the non-arbitrable claims. *Genesco*, 815 F.2d at 856; *UMC Petroleum*, 758 F.Supp. at 1074. Another factor to be considered is whether many of the central issues in the litigation will be resolved or advanced by the arbitration. *Westinghouse Elec.*, 714 F.Supp. at 1375.

■ A nonparty as well as a party to an arbitration clause can move for a stay of litigation pending arbitration. *See Cost Bros.*, 760 F.2d at 60; *Commonwealth Ins. Co. v. Beneficial Corp.*, 1987 WL 17951, * 3 (S.D.N.Y.1987). Similarly, the court may stay claims against nonparties to the arbitration agreement. *Cost Bros.*, 760 F.2d at 60; *Barrowclough*, 752 F.2d at 938.

■ Here, the only claim which could be arbitrated is Count Seven of the *Mutual* Complaint. For the reasons set forth above, the remaining eight claims in the *Mutual* Action and the claims in the *All American* Action involve significant factual allegations outside the subject matter of the Management Agreement. If Zimmerman had moved, or the Movants had proper standing to compel arbitration, and Count Seven of the *Mutual* Complaint was sent to arbitration, a stay of the remaining *Mutual* Action claims would not be warranted. The allegations contained in Count Seven of the *Mutual* Complaint are specific to Zimmerman and the claim for breach of duty of fiduciary obligations; accordingly, resolution of these allegations would not advance issues central to the other claims in the *Mutual* Action and *All American* Action or issues with respect to the Movants. The Movants would neither be involved in the arbitration proceedings nor would litigation of their claims result in duplicative litigation.

The *Security Benefit* Action asserts claims for breach of duty of good faith and fair dealing against All American and United Olympic in Counts One through Four, breach of fiduciary duty against Zimmerman in Count Five, breach of fiduciary duty against Zimmerman and Flynn in Count Six, fraud against Zimmerman, Zimmerman & Co. Flynn, Flynn & Associates and C & A in Count Seven, fraud against BMA in Count Eight and conspiracy to defraud against Zimmerman, Zimmerman & Co. Flynn, Flynn & Associates, C & A and BMA in Count Nine.

With respect to Counts Five and Six to the extent they assert a claim against Zimmerman for breach of fiduciary duty, these claims are based on factual allegations similar to those in Count Seven of the *Mutual* Complaint. Accordingly, if Zimmerman had moved to compel arbitration or the Movants had standing and Count Seven of the *Mutual* Complaint was sent to arbitration, such arbitration would advance the issues in dispute in Counts Five and Six with respect to Zimmerman's breach of fiduciary duty. Therefore, stay of Count Five and Count Six of the *Security Benefit* Action would be appropriate to the extent these claims are against Zimmerman. Stay of the other claims would be inappropriate because arbitration of the fiduciary duty claims would in no way resolve the issues involving the claims against the Movants. Moreover, the Movants would not be subject to duplicative litigation because they would not be involved in arbitration proceedings.

The *United Olympic* Action asserts claims against Transamerica only. Therefore, if Zimmerman had moved for, or if

the Movants had standing to compel arbitration and Count Seven of the *Mutual* Complaint was sent to arbitration, there would be no similarity of factual allegations necessitating a stay of the *United Olympic* Action.

As discussed, the stay aspect of this opinion has assumed the validity of the Movants' standing or that Zimmerman has moved. Because the Movants lack standing, *see, supra,* pp. 865–868, and Zimmerman has not moved, *see supra,* p. 868, n. 15, the motion to stay the consolidated action is denied.

*Conclusion*

For the reasons set forth above, the motions to compel arbitration and to stay the Consolidated Action are denied because the Movants lack standing.